**In re SCOTT COUNTY MASTER DOCKET.**

Greg **MYERS** and Jane Myers, individually and as parents and natural guardians of Andy Myers, Amy Myers and Brian Myers, minors, Plaintiffs,

v.

**SCOTT COUNTY** and R. Kathleen Morris, Scott County Attorney, Scott County Human Services, and Peg Subby, its Director of Human Services, Thomas Price, and Phipps-Yonas & Price, P.A., Paul Thomsen, Guardian Ad Litem, Doris Wilker Social Worker, and Other Employees of Scott County Human Services Whose Names and Titles are Unknown, and Douglas Tietz, Scott County Sheriff, Deputy Sheriffs Norm Pint, Patrick Morgan and Michael Busch, and City Council of Jordan, Minnesota, and Alvin Erickson, Jordan Chief of Police, Defendants.

Duane **RANK** and Dee Rank, Plaintiffs,

v.

R. Kathleen **MORRIS**, individually and as Scott County attorney, Anthony Worm, Dick Mertz, Mark Stromwall, Roland Boegeman and William Knoiarski, individually and as Scott County Commissioners and John Doe Numbers 1–15, individually and as employees and agents of Scott County a Political Subdivision of the State of Minnesota, and Scott County, Defendants.

Charles **LALLAK** and Carol Lallak, husband and wife; and Jeffrey Lallak and Jennifer Lallak, minors, by Charles Lallak and Carol Lallak, their parents and natural guardians, Plaintiffs,

v.

**SCOTT COUNTY**; Scott County Board of Commissioners; Scott County Attorney's Office; R. Kathleen Morris, Scott County Attorney; Scott County Sheriff's Department; Douglas Tietz, Scott County Sheriff; Michael M. Bush, Scott County Deputy Sheriff; Patrick Morgan, Scott County Deputy Sheriff; David Einertson, Scott County Deputy

Sheriff; Norman Pint, Scott County Deputy Sheriff; other employees of Scott County Sheriff's Department whose names and titles are unknown; Scott County Human Services Department; Rachel Paff, Social Worker with Scott County Human Services Department; Other employees of Scott County Human Services Department whose names and titles are unknown; City of Jordan; Jordan City Council; Gail Anderson, former mayor of Jordan; Donald Tillman, Mayor of Jordan; Jordan Police Department; Alvin Erickson, Jordan Police Chief; Larry Norling, Officer with Jordan Police Department; Other employees of Jordan Police Department whose names and titles are unknown; Thomas L. Price, and Phipps-Yonas & Price, P.A., Defendants.

Donald BUCHAN, Cindy Buchan, individually and as parents and natural guardians of Courtney B. Buchan, Melissa Ellen Buchan and William Donald Buchan, minors, Plaintiffs,

v.

SCOTT COUNTY and R. Kathleen Morris, Scott County Attorney, Scott County Human Services, and Peg Subby, its Director of Human Services, Thomas Price, and Phipps-Yonas & Price, P.A., Michael Shea, and Shea & Associates, P.A., Diane Johnson, Guardian Ad Litem, John Manahan, Guardian Ad Litem, Doris Wilker, Social Worker, Mary Tafs, Social Worker, Judy Dean, Social Worker, Susan Devreis, Psychologist, and Other Employees of Scott County Human Services whose names and titles are unknown, and Douglas Tietz, Scott County Sheriff, and Deputy Sheriffs Norm Pint, Patrick Morgan, and Michael Busch, Defendants.

Daniel J. MEGER and Wanda Lou Meger, individually and as parents and natural guardians of Brian Meger and Chad Meger, minors, Plaintiffs,

v.

SCOTT COUNTY, a Political Subdivision of the State of Minnesota; R. Kathleen Morris, individually and in her official capacity as attorney for Scott County; Scott County Board of Commissioners; Scott County Welfare Department and Margaret Subby, it's Director of Human Services; Scott County Sheriff's Department and it's Deputies, Patrick Morgan and Michael Bush; Doris Wilker, Social Worker, Scott County Welfare Department; Joel Kaufmann, psychologist, Scott County Welfare Department; Jane McNaught, and Center for Child and Family Therapy; B.A. Bershow, M.D., and Burnsville Family Physicians, P.A.; John Doe and Mary Doe and other employees of Scott County whose names and titles are unknown, Defendants.

Robert BENTZ and Lois Bentz, individually and as parents and natural guardians of Marlin Bentz, William Bentz and Anthony Bentz, minors, Plaintiffs,

v.

SCOTT COUNTY; R. Kathleen Morris, Scott County Attorney; Margaret Subby, Scott County Welfare Department/Director of Human Services; Doris Wilker, Social Worker, Scott County Welfare Department; Paul Thomsen, Guardian Ad Litem; Michael Bush, Patrick Morgan and Norman Pint, Scott County Deputy Sheriffs; Michael Shea, Leslie Faricy, Michael Shea and Associates; Earl Barrett; Cindy Christ; and John Doe and Mary Roe; and other employees of Scott County Human Services whose names and titles are unknown, Defendants.

Thomas and Helen BROWN, individually and as parents and natural guardians of Brandy Brown and Jeff Brown, Plaintiffs,

v.

SCOTT COUNTY and R. Kathleen Morris, Scott County Attorney, Scott County Welfare Department and Peg Subby, its Director of Human Services, Susan Phipps-Yonas and Phipps-Yonas & Price, P.A., John Manahan and Diane K. Johnson, Guardian Ad Litems, Doris Wilker Social Worker, and other Em-

ployees of Scott County Human Services whose names and titles are unknown, Defendants.

George B. GOULD, Plaintiff,

v.

COUNTY OF SCOTT, STATE OF MINNESOTA; R. Kathleen Morris, individually, and as Scott County Attorney; City of Jordan, Minnesota, and City of Jordan Police Department; Sheriff of Scott County, State of Minnesota, Defendants.

Nos. Civ. 3–85–774, 4–84–1066, 4–84–1214, 4–84–1230, 3–84–1615, 3–85–138, 3–85–336, 3–85–337 and 3–85–506.

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 2, 1985.

John R. Wylde and James William Hunter, Rapoport, Wylde & Nordby, Minneapolis, Minn., for plaintiffs Duane Rank and Dee Rank.

Thomas J. Hunziker, Hanley, Hergott & Hunziker, Minneapolis, Minn., for plaintiffs Charles Lallak and Carol Lallak.

Michael D. Madigan, Dunkley & Bennett, Minneapolis, Minn., for plaintiffs Jeffrey Lallak and Jennifer Lallak.

Patrick H. Elliott, Murphy, Blanchar, & Elliott, Minneapolis, Minn., Anthony L. Noterman and David E. Albright, Murphy, Blanchar, & Elliott, Shakopee, Minn., for plaintiffs Daniel J. Meger and Wanda Lou Meger, individually and as parents and natural guardians of Brian Meger and Chad Meger, minors.

Robert G. Gubbe, Edina, Minn. (Robert M. Frisbee, Edina, Minn., of counsel), for plaintiffs Thomas and Helen Brown, individually and as parents and natural guardians of Brandy Brown and Jeff Brown.

Barry V. Voss, Minneapolis, Minn., and Earl P. Gray, St. Paul, Minn., for plaintiffs Robert Bentz and Lois Bentz, individually and as parents and natural guardians of Marlin Bentz, William Bentz and Anthony Bentz, minors.

Marc G. Kurzman, Kurzman, Manahan & Partridge, Minneapolis, Minn., for plaintiffs Greg Myers and Jane Myers, individually and as parents and natural guardians of Andy Myers, Amy Myers and Brian Myers, minors, and for plaintiffs Donald Buchan, Cindy Buchan, individually and as parents and natural guardians of Courtney B. Buchan, Melissa Ellen Buchan and William Donald Buchan, minors.

Robert M. Frisbee, Edina, Minn., for plaintiff George B. Gould.

James T. Martin, Gislason & Martin, P.A., Edina, Minn., for defendants Scott County Attorney R. Kathleen Morris, Michael M. Busch, Scott County Deputy Sheriff; Patrick Morgan, Scott County Deputy Sheriff; David Einertson, Scott County Deputy Sheriff; Norman Pint, Scott County Deputy Sheriff; other employees of Scott County Sheriff's Department whose names and titles are unknown.

Richard J. Chadwick and Jon K. Iverson, Chadwick, Johnson & Condon, P.A., Minneapolis, Minn., for defendants Scott County, a Political Subdivision of the State of Minn. and Scott County Bd. of Com'rs. (Richard A. Beens, Minneapolis, Minn., of counsel, for Scott County), Steffen, Munstenteiger, Beens, Parta & Peterson, Anoka, Minn.

Donald F. Hunter, Gislason, Dosland, Hunter & Malecki, Minnetonka, Minn., for defendants Scott County Human Services, Peg Subby, its Director of Human Services, Doris Wilker, Social Worker, Rachel Paff, Social Worker with Scott County Human Services Dept., Mary Tafs, Social Worker, Judy Dean, Social Worker, Joel Kaufmann, psychologist, Scott County Welfare Dept., and other employees of Scott County Human Services, whose names and titles are unknown.

Loren M. Barta, New Prague, Minn., for defendant Douglas Tietz, Scott County Sheriff.

James O. Redman, Collins, Buckley, Sauntry & Haugh, St. Paul, Minn., and Frederick C. Brown, Robert H. Lynn, Thomas J. Radio, Popham, Haik, Schnobrich, Kaufman & Doty, Ltd., Minneapolis, Minn., for defendants City of Jordan; Jordan City Council, Gail Anderson, former mayor of Jordan, Donald Tillman, Mayor of

Jordan, Jordan Police Dept., Alvin Erickson, Jordan Police Chief, Larry Norring, Officer with Jordan Police Dept., Other employees of Jordan Police Dept. whose names and titles are unknown.

James F. Roegge and Douglas Muirhead, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, Minn., for defendants Thomas L. Price, Susan Phipps-Yonas, and Phipps-Yonas & Price, P.A., and Susan Devreis, Psychologist.

Phillip A. Cole and Paul C. Peterson, Lommen, Nelson, Sullivan & Cole, P.A., Minneapolis, Minn., for defendant Paul Thomsen, guardian ad litem.

James W. Kenney, Geraghty, O'Loughlin & Kenney, St. Paul, Minn., for defendants Michael Shea, Leslie Faricy, and Shea & Associates, P.A.

John M. Degnan, Bassford, Heckt, Lockhart & Mullin, P.A., Minneapolis, Minn., for defendants Diane K. Johnson, Guardian Ad Litem, and John Manahan, guardian ad litem.

Mark N. Stageberg, Lommen, Nelson, Sullivan & Cole, P.A., Minneapolis, Minn., for defendants Jane McNaught, and Center for Child and Family Therapy.

John R. McBride, Donlin and McBride, P.A., St. Paul, Minn., for defendants B.A. Bershow, M.D., and Burnsville Family Physicians, P.A.

Earl Barrett, Minneapolis, Minn., pro se.

## MEMORANDUM OPINION

MacLAUGHLIN, District Judge.

Virtually all of the defendants in the eight above captioned cases (hereafter Scott County cases) moved for dismissal and/or summary judgment. The Court heard these motions early in the litigation, either prior to or shortly after the commencement of discovery depositions. The Court quickly announced its rulings in terse orders to enable successfully moving defendants to avoid the burdens of discovery. This Memorandum Opinion sets forth the rationale for those rulings, but it does not deal with *Gould v. County of Scott* (CIVIL 3–85–506). The Court's Memorandum and Order of June 26, 1985 fully explains why the Court granted summary judgment in favor of all the defendants in *Gould*.[1]

## I. OVERVIEW

On September 26, 1983, Chris Brown contacted the City of Jordan Police Department because she feared that James Rud had sexually abused her ten-year-old daughter and her eight-year-old son. Jordan Police arrested Rud that same evening on charges of sexually abusing children. The arrest and questioning of Rud set into motion what became known as the "Jordan sex ring investigation." The initial interview with Chris Brown's children led investigators to additional purported victims of sexual abuse. The number of suspects also continued to expand as the investigation proceeded. From the date of Rud's arrest until June 6, 1984, an additional 23 individuals from the Jordan area in Scott County, Minnesota were criminally charged with sexually abusing children. Once charged with sexually abusing children, most parents had their children taken away from them by Scott County officials.

Plaintiffs in the present actions were arrested during a period from January 11, to June 4, 1984. Thomas and Helen Brown were arrested on January 11, 1984; Robert and Lois Bentz were arrested on January 20, 1984; Greg Myers was arrested on February 6, 1984; Jane Myers, Charles and Carol Lallak, and Duane and Dee Rank all were arrested on May 23, 1984; and Donald and Cindy Buchan were arrested on June 4, 1984. At the time of their arrests, these plaintiffs, except for the Lallaks and the Ranks, had their children taken away from them. (The Ranks have no children and the Lallaks removed their children

1. Subsequent to the Court's rulings in the eight Scott County cases, two new Scott County cases were filed: *Kath v. Morris* (CIVIL 3–85–1091) and *Meisinger v. Scott County* (CIVIL 4–85–869). This Memorandum Opinion does not deal with *Kath* or *Meisinger.*

from Scott County prior to their arrests.) Two other plaintiffs, Daniel and Wanda Meger, were never arrested. The Meger children were separated from their parents on June 5, 1984. Defendants state that this separation was the result of Wanda Meger consenting to voluntary placement of the children with the County, while Wanda Meger contends that she was pressured and misled into signing the placement agreement. *See* Morris aff. ¶ XXXIII, and exh. U; Wilker aff. ¶ XXXVII; Meger aff. ¶ 47–51.

Of all the criminal cases involving the Jordan sex ring, only the Bentz case went to trial.[2] In September of 1984, the jury acquitted the Bentzes of all counts. On October 15, 1984, Scott County Attorney R. Kathleen Morris dismissed the charges against the remaining Jordan sex ring defendants. Morris explained the dismissal of these allegations as necessary to avoid prejudicing an investigation of great magnitude, which was a reference to an investigation of alleged homicides in Scott County. Morris also noted that further criminal trials would harm the children who had to appear as witnesses. Subsequently, state and federal authorities assumed control over further investigations and legal proceedings involving alleged Scott County child abusers. These authorities did not reinstate criminal actions against any of the 21 individuals who had their charges dismissed.

After dismissal of the criminal allegations, the plaintiffs filed the present actions in federal court under 42 U.S.C. § 1983 and various state laws. Plaintiffs who have children also are suing on behalf of their children. The list of defendants varies slightly from case to case, but most defendants are present in more than one lawsuit. All plaintiffs have named Morris and Scott County as defendants. The other defendants in these actions are the Sheriff of Scott County, Douglas Tietz; four Scott County deputy sheriffs; therapists who had contact with the children; a therapist who conducted an adverse examination of two plaintiffs who were criminal defendants; guardians ad litem appointed by the Scott County Family Court to protect the interests of children; the Scott County Department of Human Services and individual employees of the department; the Scott County Board of Commissioners; the City of Jordan; the Jordan City Council; the former and current mayor of the City of Jordan; the Jordan Police Department; Jordan Police Chief Alvin Erickson; a Jordan police officer; a foster parent of one of the children; the director of a halfway house in which one of the children stayed; and a doctor who examined some of the children.

## II. VIABILITY OF PLAINTIFFS' CLAIMS

The major theme of plaintiffs' allegations against the defendants is that the arrests of various plaintiffs and the separation of parents from their children were improper. Plaintiffs assert that the various defendants acted in concert to bring about the arrests and separations of parents and children, and that the actions of the defendants prolonged the separation of parents and children. Plaintiffs further assert that by repeatedly questioning child witnesses, defendants were able to wear down or brainwash the children into making accusations against adults. In effect, plaintiffs allege that defendants coerced the children to give the responses defendants desired. The thrust of plaintiffs' charges can be further gleaned from the following paragraph, because each complaint, except the Ranks', contains a virtually identical paragraph.

The aforesaid actions by Defendants were acts in furtherance of a conspiracy. Defendants, and specifically R. Kathleen Morris and her office, were engaged in a publicity campaign against child abuse and incest. Part of this campaign involved the invention by Defendant Morris and others of a "sex ring" in Jordan,

---

**2.** James Rud was the only Jordan sex ring defendant adjudicated guilty. Rud was charged with 108 counts of sexually abusing children, and he pled guilty to ten counts.

Minnesota. Defendants attempted to legitimize this invented "sex ring" by producing a large number of arrests and prosecutions in Jordan for sexual abuse of children. In furtherance of this conspiracy, Defendants recklessly sought out the [plaintiffs] as candidates for prosecution. These arrests were thus made without making any adequate substantiated inquiries regarding the welfare of the Plaintiffs' minor children and without probable cause and in willful disregard of Plaintiffs' rights, privileges and immunities secured by the United States Constitution and the law and Constitution of the State of Minnesota.

Lallak complaint ¶ 29.

■ Plaintiffs have brought their lawsuits in federal court because they maintain that defendants' conduct is actionable under 42 U.S.C. § 1983. In order to state a claim under section 1983, a plaintiff must allege that a person acting under color of state law violated a federally protected right. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). Individual defendants, in addition to raising the defenses of absolute and qualified immunity, argue that plaintiffs' allegations do not state a claim under section 1983 against them. Before examining the arguments of specific defendants, the Court will determine whether plaintiffs' allegations state a claim for relief in a general sense. Not all of plaintiffs' accusations apply to each defendant, but the following section essentially treats defendants generically to see if plaintiffs' claims contain a viable cause of action against any defendant. The Court will then discuss the arguments unique to specific defendants.

**A. Fourth Amendment**

■ Plaintiffs clearly do have a fourth amendment right not to be arrested unless probable cause justifies the arrest. *E.g.*, *United States v. Watson*, 423 U.S. 411, 417–18, 96 S.Ct. 820, 824–25, 46 L.Ed.2d

598 (1976); *Carroll v. United States*, 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925). A person arrested without probable cause, moreover, can seek redress under section 1983. *E.g.*, *Herrera v. Valentine*, 653 F.2d 1220, 1229 (8th Cir.1981); *Wheeler v. Cosden Oil and Chemical Co.*, 734 F.2d 254, 260 (5th Cir.), *mod. on other grounds*, 744 F.2d 1131 (1984); *Clark v. Lutcher*, 436 F.Supp. 1266, 1268, 1272–73 (M.D.Pa.1977). The mere fact that a person arrested is later acquitted or the charges against him or her are dropped, however, does not by itself subject the arresting officials to section 1983 liability. *Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). Neither should arresting officials be liable to arrestees if the officials reasonably believed probable cause did exist. *See Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir.1981), *cert. denied*, 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). Yet a police officer cannot claim he or she simply made a mistake if the officer knew that no probable cause existed, or if the officer was reckless in concluding that probable cause existed. Plaintiffs here assert that the defendants recklessly disregarded the truth in concluding that probable cause existed for plaintiffs' arrests.

Defendants respond that plaintiffs do not have a viable section 1983 claim based on the fourth amendment under any circumstances because independent judicial officers concluded that probable cause did exist for plaintiffs' arrests.[3] The argument runs that even if defendants committed transgressions prior to the judicial officer's probable cause determinations, the judicial officer's findings of probable cause insulate defendants from liability. *Citing Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). The Court cannot accept this contention. In *Ames v. United States*, 600 F.2d 183, 185 (8th Cir.1979), the court did state that a grand jury indictment breaks the chain of causation between in-

---

**3.** Arrest warrants were obtained prior to the arrests of all plaintiffs except in the cases of Greg Myers and the Buchans. In these two situations, a judge determined that probable cause existed within two days of the arrests.

vestigatory activities and resulting harm to a plaintiff, thus insulating the investigators from liability. The court noted, however, that the indictment would not break the chain of causation if the plaintiff alleged acts such as the presentation of false evidence to, or the withholding of truthful evidence from the grand jury. *Ames*, 600 F.2d at 185; *see also Rodriguez v. Ritchey*, 556 F.2d 1185, 1195 (5th Cir.1977) (en banc) (Hill, J. concurring),[4] *cert. denied*, 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 799 (1978) (officer who maliciously seeks an indictment is not shielded from liability simply by obtaining it). *Ames* dealt with presenting information to a grand jury, but its reasoning should also apply to presenting tainted information to a judicial officer who has to decide whether or not to issue an arrest warrant. *See Dick v. Watonwan County*, 551 F.Supp. 983, 993 (D.Minn. 1982) (section 1983 action could lie against welfare workers who presented information to county attorney where welfare workers failed to corroborate evidence, fabricated evidence, and misleadingly presented information). *Dick v. Watonwan County*, 562 F.Supp. 1083, 1097–98 (D.Minn.1983) (officials can be subject to section 1983 liability for conduct in procuring court orders) (citing cases), *rev'd in part on other grounds*, 738 F.2d 939 (8th Cir.1984).

■ In the Scott County cases, the plaintiffs are arguing that defendants knew or should have known the information presented to judicial officers was false. Such accusations may or may not be true, but they do state a claim under section 1983.

---

4. Although this statement was made in concurrence, a majority of the panel endorsed this proposition. *See Rodriguez*, 556 F.2d at 1195–96 (Goldberg, J., dissenting); *Dick v. Watonwan County*, 562 F.Supp. 1083, 1099 (D.Minn.1983), (discussing *Rodriguez*), *rev'd in part on other grounds*, 738 F.2d 939 (8th Cir.1984).

5. The Ranks do not have children, and thus they are not asserting that defendants violated their liberty interest in maintaining the family.

In addition, the Megers and the Lallaks present a unique situation in comparison to the other plaintiffs. Defendants state that Wanda

## B. Liberty Interest

■ The other major constitutional violation plaintiffs assert is based on the separation of the parents from their children. Undoubtedly, plaintiffs have a protected liberty interest under the fourteenth amendment in keeping their family unit together. *E.g., Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 212, 31 L.Ed.2d 551 (1972); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir.1977). The United States Court of Appeals for the Eighth Circuit has recently emphasized that "[t]he privacy and autonomy of familial relationships ... are unarguably among the protectible interests which due process protects. We can conceive of no more important relationship, no more basic bond in American society, than the tie between parent and child." *Bohn v. County of Dakota*, 772 F.2d 1433, 1435 (8th Cir.1985). Plaintiffs claim that the false accusations defendants created caused the separation of children from parents. Defendants do not dispute that plaintiffs have a protected liberty interest in their family relationships.[5] Nevertheless, defendants contend that even accepting plaintiffs' allegations as true, plaintiffs still do not have a viable section 1983 action for infringement of their liberty interests. Defendants reason that plaintiffs received all the process that was due through the procedures of the Scott County Family Court and the Minnesota Rules of Procedure for Juvenile Court (Minn.R. Juv.P.). Defendants point out that after children were separated from their parents,

---

Meger assented to a voluntary placement of the Meger children with Scott County. Yet Meger states that she was pressured and misled into signing the placement agreement. The Lallaks never had their children taken away by Scott County because the Lallaks removed the children from the jurisdiction prior to being arrested. The Lallaks claim that defendants' conduct forced the Lallaks to remove their children from the jurisdiction of Scott County. The Lallaks add that once they were arrested, they were legally forbidden from contacting their children.

the parents were entitled to a hearing within 72 hours to determine if probable cause justified the separation. *See* Minn.Stat. § 260.171, subd. 2, Minn.R.Juv.P. 52.04. All parent plaintiffs who had children taken away from them either received or waived these hearings. Parent plaintiffs were also entitled to informal court review of the placement of their children every eight days. Minn.R.Juv.P., 52.07, subd. 1. Again, the parent plaintiffs either received or waived these informal reviews. In addition, parent plaintiffs had a variety of other procedural rights under the rules. *E.g.,* Minn.R.Juv.P. 52.04, subd. 4(d) (right to counsel) 52.07, subd. 2 (right to request formal placement review by the court), 57.01–.09 (right to conduct discovery); 59.02 (right to trial on allegations of child abuse within 90 days of denial of the allegations).

Defendants conclude that plaintiffs' rights under state law and procedural rules were sufficient to protect plaintiffs' liberty interest in their families. Relying on *Parratt,* 451 U.S. at 537, 101 S.Ct. at 1914, defendants argue that because state law provided adequate remedies after plaintiffs' children were removed, (*i.e.,* post-deprivation remedies), the separations of the families were accomplished with due process. Although *Parratt* involved a property right, defendants point to cases which have applied the *Parratt* adequate state remedies analysis to liberty interests. *E.g., Thibodeaux v. Bordelon,* 740 F.2d 329, 337 (5th Cir.1984). In fact, a court in the District of Minnesota recently applied *Parratt* to an intentional deprivation of a liberty interest. *Hanson v. Larkin,* 605 F.Supp. 1020 (D.Minn.1985) (plaintiff could not sue police officer who allegedly assaulted plaintiff, because state tort action provided adequate state remedies). *But see Quaschnick v. State of Minnesota,* 106 F.R.D. 587 (D.Minn.1985) (Murphy, J.); *Spell v. McDaniel,* 591 F.Supp. 1090, 1103–07 (E.D. N.C.1984).

■ Defendants further draw upon *Ellis v. Hamilton,* 669 F.2d 510 (7th Cir.) (Pos-ner, J.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). *Ellis* held that due process is not violated "if the state provides reasonable remedies for preventing families from being arbitrarily broken up by local domestic relations officers". *Ellis,* 669 F.2d at 515. *Ellis* does state that due process is not violated if state procedures exist to correct "inevitable errors" or "blunder[s]" of local officials regarding custody matters. *Ellis,* 669 F.2d at 514. Here, however, plaintiffs allege that defendants fabricated sexual abuse charges in reckless disregard for the truth and in willful indifference for plaintiffs' rights. If these allegations are true, defendants' conduct would be more culpable than simple errors or blunders.

■ Another reason for rejecting defendants' adequate state remedies argument concerns the nature of the liberty interest involved. Plaintiffs' liberty interest in their families being together involves a right protected not only by procedural due process, but also by substantive due process. In *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) the Supreme Court struck down a zoning ordinance which had the effect of prohibiting a grandparent from living with one of her grandsons. The plurality stated that substantive due process protected the right of an extended family to live together. *Moore,* 431 U.S. 502–03, 97 S.Ct. at 1937. The grandparent in *Moore* was not challenging any procedures (*e.g.,* the method by which the ordinance was adopted or the method by which the grandparent was fined for violating the ordinance). Rather, the grandparent attacked the result of the ordinance, and the Supreme Court agreed that the result was improper.

■ The ability of plaintiffs to assert violations of substantive due process is not affected by the availability of adequate state remedies. The *Parratt* analysis of available adequate state remedies applies to only violations of procedural due process

and not to violations of substantive constitutional proscriptions. *L & H Sanitation, Inc. v. Lake City Sanitation, Inc.*, 769 F.2d 517, 523–24 (8th Cir.1985); *Lavicky v. Burnett*, 758 F.2d 468, 472 n. 1 (10th Cir. 1985); *Spell*, 591 F.Supp. at 1106–07. Accordingly, plaintiffs' claim that defendants violated plaintiffs' liberty interest in maintaining their family units is a viable claim under section 1983.

In sum, plaintiffs' allegations do in a general sense state claims upon which relief can be granted under section 1983. If plaintiffs' complaints had failed this initial hurdle, then all defendants would have been entitled to summary judgment. Plaintiffs' passing this threshold does not mean, however, that all defendants' summary judgment motions should be denied.

## III. PROCEDURAL POSTURE

### A. Summary Judgment

Nearly every defendant in the Scott County cases has moved for dismissal (under either Fed.R.Civ.P. 12(b)(6) or 12(c)) or in the alternative for summary judgment pursuant to Fed.R.Civ.P. 56.[6] Numerous parties submitted affidavits and other materials outside the pleadings. Although nearly all defendants did technically move for dismissal as well as summary judgment, defendants typically relied heavily on matters outside the pleadings and spoke only in terms of summary judgment in their arguments. Because the Court did not exclude from its consideration these matters outside the pleadings, the Court must treat defendants' motions as motions for summary judgment. Fed.R.Civ.P. 12(b); *Carter v. Stanton*, 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972) (per curiam); *Court v. Hall County, Nebraska*, 725 F.2d 1170, 1172 (8th Cir. 1984).

A defendant is not entitled to summary judgment unless the defendant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). Summary

judgment is an extreme remedy that should not be granted unless the moving party has established a right to judgment with such clarity as to leave no room for doubt and unless the nonmoving party is not entitled to recover under any discernible circumstances. *E.g., Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076, 1077 (8th Cir.1980). In considering a summary judgment motion, a court must view the facts most favorably to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *E.g., Hartford Accident & Indemnity Co. v. Stauffer Chemical Co.*, 741 F.2d 1142, 1144–45 (8th Cir.1984). The nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Salinas v. School District of Kansas City*, 751 F.2d 288, 289 (8th Cir.1984).

In most cases, a motion for summary judgment at this early stage of the litigation would be premature. Summary judgment is inappropriate in complex litigation where the party resisting summary judgment has not had the opportunity to conduct and complete discovery. *See Willmar Poultry Co. v. Morton-Norwich Products, Inc.*, 520 F.2d 289, 293 (8th Cir.1975), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976); Fed.R.Civ.P. 56(f). Providing a party opposing summary judgment ample opportunity to conduct discovery is especially important when relevant knowledge and facts are exclusively or largely within control of the party moving for summary judgment. *See Willmar Poultry Co.*, 520 F.2d at 294; 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2741, at 545 (1983).

Defendants respond that even though discovery was just commencing when they made their motions, the Court should still require plaintiffs to meet, at this juncture defendants' affidavits sufficiently to create

---

**6.** Defendants also sought to stay discovery pending resolution of their summary judgment motions. The Court denied these motions from the bench on May 22, 1985.

genuine issues of material fact. Defendants reason that other sources have provided plaintiffs with adequate access to information regarding the Scott County cases. These sources include the Minnesota Attorney General's investigation and report, *see Report on Scott County Investigations*, February 12, 1985; criminal discovery associated with the Bentz trial, and other criminal trials which were to take place; and proceedings in Scott County Family Court. Defendants conclude that if information exists to respond to their affidavits, plaintiffs should have already discovered that information.

■ While defendants are correct that some plaintiffs have had access to relevant information prior to the commencement of discovery in these civil suits, the Court cannot accept defendants' contention that these outside sources preclude plaintiffs from conducting the normal discovery associated with a civil lawsuit in order to rebut defendants' affidavits. *Cf. Marrese v. American Academy of Orthopaedic Surgeons*, 726 F.2d 1150, 1161 (7th Cir.1984) (en banc) (party opposing summary judgment must be allowed to conduct discovery to resist summary judgment), *rev'd on other grounds*, —— U.S. ——, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). The other sources of information to which defendants point, moreover, have not provided plaintiffs with the opportunity to take depositions of the many witnesses plaintiffs wish to depose.

**B. Qualified Immunity**

■ All defendants who are individuals (in contrast to political entities or agencies) claim to be entitled to summary judgment at this stage in the proceedings on the basis of qualified immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Governmental officials do enjoy a qualified (or good faith) immunity defense in section 1983 actions. *See Harlow*, 457 U.S. at 806, 102 S.Ct. at 2732. In *Harlow*, the Supreme Court redefined the qualified immunity defense in order to strengthen it. Previously, the qualified immunity defense had a subjective, as

well as an objective, component. In order to prevail on the basis of qualified immunity, defendants had to satisfy both aspects. Defendants would meet the objective prong by showing that they did not know, and should not reasonably have known, that their conduct violated the constitutional rights of plaintiffs. Defendants would meet the subjective prong by establishing that they did not act with malicious intent to deprive the constitutional rights of, or otherwise injure, plaintiffs. *Harlow*, 457 U.S. at 815, 102 S.Ct. at 2736, *citing Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). Under this formulation of qualified immunity, plaintiffs could escape summary judgment even in situations where no dispute existed that the defendants' actions were objectively reasonable. *See Harlow*, 457 U.S. at 815, 102 S.Ct. at 2736. Plaintiffs argued that even if defendants' conduct was objectively reasonable, the defendants' acted with malicious intent. *Harlow*, 457 U.S. at 815, 102 S.Ct. at 2736. The determination of the defendants' intent was a subjective issue normally for a jury to resolve, and thus summary judgment would often be inappropriate. The *Harlow* Court accordingly eliminated the subjective component of the qualified immunity defense in order to reduce the number of trials governmental officials had to face. *Harlow*, 457 U.S. at 816–17, 102 S.Ct. at 2737. *See also Davis v. Scherer*, —— U.S. ——, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984).

The *Harlow* Court held "that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. The *Harlow* Court stated that under its new definition, many insubstantial claims against government officials could be resolved on summary judgment motions. *Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738. This procedure would spare government officials from unjustifiably being subjected to trials and broad-reaching dis-

covery. *Harlow,* 457 U.S. at 817–18, 102 S.Ct. at 2737–38. The Supreme Court elaborated:

> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.... If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

*Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738.

 Defendants point to the language in *Harlow,* which states that a court should not allow discovery until it resolves the threshold immunity question, and conclude that they are presently entitled to summary judgment. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. *Harlow,* however, provides for defendants obtaining summary judgment *prior* to discovery only in certain situations. *Harlow* states that prior to allowing discovery, a court should determine if the plaintiff is claiming that the defendant violated "clearly established" law. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

If the law a plaintiff claims a defendant violated was not clearly established at the time of the alleged violation, the defendant is entitled to summary judgment prior to discovery. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. On the other hand, if the law which plaintiff claims defendant violated was clearly established, a defendant is not entitled to summary judgment prior to discovery. *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738; *Hobson v. Wilson,* 737 F.2d 1, 26–27 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); *Finch v. Wemlinger,* 361 N.W.2d 865, 868–69 (Minn.1985). Therefore, the only situation in which summary judgment is appropriate prior to discovery, is where the court concludes that even if the defendant committed the alleged violation of plaintiff's rights, those rights were not well established at the time of the violation. *See Hobson,* 737 F.2d at 26–27; *Finch,* 361 N.W.2d at 868–69.[7]

 The rights the Scott County plaintiffs claim were violated, however, are clearly established. Plaintiffs assert that they were arrested without probable cause, and this right is beyond question. *See, e.g., Carroll,* 267 U.S. at 156, 45 S.Ct. at 286 (1925). Plaintiffs additionally claim that their liberty interests in maintaining their family units were violated, and the right of the family to remain together is also firmly established. *See, e.g., Moore,* 431 U.S. at 502–03, 97 S.Ct. at 1937 (1977); *Stanley,* 405 U.S. at 651, 92 S.Ct. at 1212 (1972); *Dennison v. Vietch,* 560 F.Supp. 435, 442 (D.Minn.1983).[8] Plaintiffs maintain that defendants violated these well founded

---

**7.** *Harlow's* elimination of the subjective component of the qualified immunity defense is not to the contrary. True, plaintiffs can no longer avoid summary judgment merely by asserting defendants acted with subjective bad faith. Yet in cases involving the violation of clearly established rights, plaintiffs are entitled to attempt to show that defendants' conduct, judged by objective standards, violated those rights. In such a situation, a court cannot simply accept defendants' version of the facts as true, rather a court must allow plaintiffs to conduct discovery.

**8.** *Harlow* also declares that a defendant might still be able to prevail on a qualified immunity

defense even in cases where the law violated was clearly established, if the defendant could show extraordinary circumstances such that the defendant did not know or should not have known of clearly established rights. *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738. The determination that a defendant was not or should not have been aware of well established rights is a factual question and could potentially be an issue for trial; *Hobson,* 737 F.2d at 26–27; *Finch,* 361 N.W.2d at 869. Resolving this issue as a threshold matter prior to discovery, therefore, would be inappropriate.

rights by fabricating accusations against plaintiffs in reckless disregard of the truth. Fabrication of criminal charges is conduct which is definitely actionable under section 1983. *See, e.g., Beard v. Udall,* 648 F.2d 1264 (9th Cir.1981) (per curiam). *Cf. Losch v. Borough of Parkesburg,* 736 F.2d 903, 907 (3d Cir.1984) (filing charges without probable cause and for reasons of personal animosity *clearly* actionable under § 1983). Plaintiffs further assert that defendants coerced witnesses to make the desired accusations. Coercing individuals to give false testimony in order to obtain criminal convictions is conduct clearly actionable under section 1983. *See, e.g., Robichaud v. Ronan,* 351 F.2d 533, 536–37 (9th Cir.1965); *Lewis v. Brautigam,* 227 F.2d 124, 128–29 (5th Cir.1955) (both cited in *Imbler v. Pachtman,* 424 U.S. 409, 430 n. 31, 96 S.Ct. 984, 995 n. 31, 47 L.Ed.2d 128 (1976)).

Defendants, moreover, have not argued that fabricating accusations against individuals and coercing testimony cannot implicate clearly established rights.[9] Defendants do state that they never engaged in such conduct and that the actions they took cannot be equated with such conduct. In support of their assertions, defendants submit numerous affidavits delineating their involvement in the Scott County cases. Defendants conclude that these affidavits, and plaintiffs' failure to rebut them, entitle defendants to summary judgment prior to discovery.

This argument misconstrues what the Court's inquiry should be at this juncture. In a recent pronouncement on the qualified immunity defense, the Supreme Court no longer speaks in terms of "summary judgment" prior to discovery based on *Harlow;* instead, the Supreme Court states that "dismissal" prior to discovery is appropriate if plaintiff's complaint fails to state a claim of violations of clearly established law. *Mitchell v. Forsyth,* —— U.S. ——,

105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). *Mitchell* indicates, therefore, that the issue present in evaluating a qualified immunity defense raised prior to discovery is not whether plaintiffs have adequately responded to defendants' affidavits, but rather whether plaintiffs have asserted violations of clearly established rights. Here, plaintiffs have asserted violations of clearly established rights, and thus the existence of defendants' affidavits does not entitle defendants to summary judgment at this time.

Of course, at the close of discovery if plaintiffs cannot rebut defendants' affidavits and evidence sufficiently to create a genuine issue of fact as to whether defendants actually committed the alleged transgressions, then defendants may be entitled to summary judgment. *See Mitchell,* 105 S.Ct. at 2816. In evaluating defendants' summary judgment motions made at the close of discovery, if any, the Court will look to the objective reasonableness of defendants' conduct. At this point if no genuine factual issues exist regarding whether defendants' actions were objectively reasonable, then defendants will be entitled to summary judgment. *Mitchell,* 105 S.Ct. at 2816.

## IV. SPECIFIC DEFENDANTS

### A. County Attorney Morris

All plaintiffs have named R. Kathleen Morris as a defendant. Defendant Morris is the duly elected Scott County Attorney. As Scott County Attorney, Morris (with the aid of her staff) prepared and signed the criminal complaints against the plaintiffs who were arrested. Children of the arrested plaintiffs [10] were separated from their parents as the result of neglect petitions brought by the Scott County Human Services Department (HSD). *See* Minn.Stat.

---

**9.** The concept that such acts could implicate clearly established rights is not legalistic or esoteric. A reasonable lay person would appreciate the wrongfulness of fabricating accusations and coercing witnesses where such acts had the potential of leading to arrests and the separa-

tion of parents and children. *See Dick,* 562 F.Supp. at 1104.

**10.** For somewhat atypical situations see *supra* note 5.

§ 260.133. Morris reviewed, approved, and signed these neglect petitions.

Morris states that in the early stages of the Jordan sex ring investigation (*i.e.*, fall and early winter of 1983) her involvement was limited to drafting criminal complaints, making court appearances, and contacting law enforcement personnel regarding new information in previously charged criminal cases. Morris aff. ¶ VII. Morris acknowledges that she occasionally met child witnesses, but maintains that she did not conduct substantive interviews with child witnesses until she began preparing for upcoming criminal trials. These trial preparation interviews commenced after February, 1984. Morris aff. ¶ VII. Morris subsequently conducted the prosecution of the Bentzes in August and September of 1984. The jury acquitted the Bentzes on September 19, 1984. On October 15, 1984, Morris announced her decision to dismiss the charges against the 21 remaining Scott County residents facing sexual abuse allegations.

Morris portrays her role in the Jordan sex ring cases as only that of a prosecutor. She states that she had minimal involvement with the investigation and that she had substantive contact with child witnesses only in the context of preparing for upcoming trials. Plaintiffs strongly contest Morris' characterization of her role in these cases. Plaintiffs contend that Morris assumed control of the investigation, and they argue she was thus performing duties outside of prosecutorial functions. Plaintiffs claim that Morris, acting in concert with the other defendants, used the investigation to fabricate accusations of child sexual abuse against the adult plaintiffs. Purportedly, Morris directed an investigation which recklessly sought out plaintiffs as candidates for prosecution in willful disregard of plaintiffs' rights. Specific transgressions include repeated interviews of child witnesses in order to coerce them into making accusations, destruction of evidence, and withholding of exculpatory evidence. Apparently, plaintiffs claim that Morris personally performed some of these acts, and that she directed other defendants to commit other acts.

Defendant Morris denies all of plaintiffs' allegations. Morris argues, moreover, that even assuming the truth of plaintiffs' allegations, she is absolutely immune from suit under section 1983 because all of her alleged transgressions involve acts within her role as a prosecutor. Morris adds that the defense of qualified immunity also entitles her to summary judgment at this juncture.

### 1. Prosecutorial Immunity

While all governmental officials enjoy the defense of qualified immunity in section 1983 actions, only a limited number of officials can rely on absolute immunity. *See Ray v. Pickett*, 734 F.2d 370, 371–72 (8th Cir.1984). Prosecutors are one of the select few governmental officials who may be able to assert absolute immunity. *Imbler v. Pachtman*, 424 U.S. 409, 427, 96 S.Ct. 984, 993, 47 L.Ed.2d 128 (1976). Prosecutors, however, do not enjoy absolute immunity for every action they undertake. In *Imbler*, the Supreme Court held only that a prosecutor was absolutely immune in initiating a prosecution and presenting the state's case. *Imbler*, 424 U.S. at 431, 96 S.Ct. at 995. The Supreme Court reasoned that these prosecutorial functions were "intimately associated with the judicial phase of the criminal process" and thus warranted absolute immunity. *Imbler*, 424 U.S. at 430, 96 S.Ct. at 995. The *Imbler* Court, while granting absolute immunity to the prosecutor as an advocate, declined to decide whether the prosecutor acting as an administrator or an investigator was entitled to absolute immunity. *Imbler*, 424 U.S. 430–31, 96 S.Ct. at 994–95; *Ray*, 734 F.2d at 374.

In the Eighth Circuit, the rule regarding prosecutorial immunity is clear. Prosecutors enjoy absolute immunity only for actions within the scope of their prosecutorial duties. *Smith v. Updegraff*, 744

F.2d 1354, 1364 (8th Cir.1984).[11] Thus, prosecutors can assert absolute immunity for their prosecutorial functions, but not for their administrative or investigative duties. *Dick v. Watonwan County*, 551 F.Supp. 983, 992 (D.Minn.1982). For actions taken in these latter roles, prosecutors still can assert the defense of qualified immunity, just like any other public official. *See Imbler*, 424 U.S. at 430, 96 S.Ct. at 994.

Accordingly, the central issue in determining whether Morris is entitled to absolute immunity involves classifying her alleged transgressions as prosecutorial, administrative, or investigative. The *Imbler* Court recognized that "[d]rawing a proper line between these functions may present difficult questions...." *Imbler*, 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33; *accord Wilkinson v. Ellis*, 484 F.Supp. 1072, 1083 (E.D.Pa.1980). The determination of whether a prosecutor's actions were prosecutorial or investigatory sometimes requires a limited factual inquiry. *Forsyth v. Kleindienst*, 599 F.2d 1203, 1215 (3d Cir.1979), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981); *see also Bushouse v. County of Kalamazoo*, 93 F.R.D. 881, 884 (W.D.Mich.1982). Of course, permitting a factual inquiry on the issue of whether actions were prosecutorial or investigatory dilutes somewhat the protection of prosecutorial immunity, but this dilution may be necessary in some cases. *Forsyth*, 599 F.2d at 1215.

### a. General Allegations that Morris Acted as an Investigator

Plaintiffs assert that defendant Morris is not entitled to absolute immunity because many of her alleged transgressions involved her acting in an investigative role. For instance, Morris and others supposedly used suggestive and coercive interviewing techniques to elicit the desired responses from children, *i.e.*, that adults had sexually abused them. Plaintiffs claim that children often stated that they were not sexually abused, but that interviewers suggested, cajoled, rewarded, and simply wore down the children until they emitted the correct response.

If Morris' interviews of children were in fact investigatory (as opposed to in preparation for trial) then absolute immunity may not cloak Morris for her actions during the interviews. In *Imbler*, the Supreme Court "recognized that the duties of the prosecutor in [her] role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Imbler*, 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33. The Court further noted that "[p]reparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence." *Imbler*, 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33. The Court acknowledged, however, that at some point a prosecutor begins to function in roles other than as an officer of the court. *Imbler*, 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33.

Preliminary evidence gathering which may blossom into potential prosecutions is investigatory activity outside the scope of absolute immunity. *Rex v. Teeples*, 753 F.2d 840, 844 (10th Cir.1985), *citing McSurely v. McClellan*, 697 F.2d 309, 320 (D.C.Cir.1982) (per curiam) and *Marrero v. City of Hialeah*, 625 F.2d 499, 505 (5th Cir.1980), *cert. denied*, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981). The *Rex* court held that a prosecutor's interrogation of a general suspect was police-type or investigatory work not entitled to absolute immunity. *Rex*, 753 F.2d at 844. The *Marrero* court reasoned that a prosecutor who assists, directs, or participates with police in gathering evidence prior to an indictment acts as an investigator rather than a prosecutor. *Marrero*, 625 F.2d at 505.[12]

---

**11.** This rule is widely accepted throughout the lower courts. *Bushouse v. County of Kalamazoo*, 93 F.R.D. 881, 883 (W.D.Mich.1982). *See also* Note, *Supplementing the Functional Test of Prosecutorial Immunity*, 34 STAN.L.REV. 487, 492 (1982).

**12.** The court stated, however, that some preindictment activities, such as interviewing grand

 Here, plaintiffs assert that Morris was acting in an investigatory role, and they have provided indications that defendant Morris actually took over the Jordan sex ring investigation at an early stage. In support of this assertion, a number of plaintiffs point to the December 28, 1984 rough notes of Minnesota Bureau of Criminal Apprehension (BCA) agent Ray Perron (hereafter Perron notes). Scott County deputy sheriff Menden allegedly told Perron that Morris had "actually usurped [Scott County Sheriff Tietz'] power by transferring [children's] interviews to her office." Perron aff., Perron notes at 4. Supposedly, Menden further stated that Morris "took charge of calling the children in for interviews" and that the "bulk of the interviewing" of children would take place in Morris' office. Perron aff., Perron notes at 2. Menden concluded that Morris' work in conducting interviews "was more in the investigative area than prosecutorial area." Perron aff., Perron notes at 4.

Deputy Menden did not provide a time frame for when Morris allegedly began conducting child interviews, but Jordan police officer Larry Norring did.[13] FBI special agent Erwin interviewed Norring on December 19, 1984 and Erwin later summarized the interview in a report dated December 27, 1984 (hereafter Erwin Report). Norring purportedly stated that Morris "got actively involved in the investigation around November 1983."[14] Erwin Report at 2. Norring further indicated that Morris or members of her staff personally began interviewing children in the spring. Erwin Report at 2. The reference to spring must have been the spring of 1984, because the spring of 1983 was prior to James Rud's September, 1983 arrest.

Deputy Menden has, however, submitted an affidavit in which he denies having made the statements concerning Morris' usurpation of power which Perron attributes to him. Menden aff. ¶ 6. In addition, Morris claims that she was not conducting

interviews of children in the fall and early winter of 1983. Morris aff. ¶ VII. She states that during that period law enforcement officers used her offices for interviews because of space limitations elsewhere. See Morris aff. ¶ VII. Morris notes that she would meet the children at these interviews, but she maintains that she did not conduct any substantive interviews of the children. According to Morris, she began meeting and interviewing child witnesses in preparation for upcoming trials after February of 1984. Morris aff. ¶ VII.

 The Court cannot, however, simply accept defendant Morris' version of the facts at this juncture. See Hartford Accident & Indemnity Co. v. Stauffer Chemical Co., 741 F.2d 1142, 1144–45 (8th Cir. 1984). Plaintiffs have alleged that Morris acted in an investigatory role, and plaintiffs do provide some support for their contentions. If Morris were directing the Jordan sex ring investigation, and she instructed others to engage in improper acts, Morris would not be entitled to absolute immunity. A prosecutor who directs illegal investigatory activities is not cloaked by absolute immunity even if the prosecutor did not personally perform the improper acts. See Robichaud v. Ronan, 351 F.2d 533, 537 (9th Cir.1965); cf. Butz v. Economou, 438 U.S. 478, 505–06, 98 S.Ct. 2894, 2910–11, 57 L.Ed.2d 895 (1978). Accordingly, the Court cannot conclude at this time that all of Morris' alleged transgressions involved activities within her prosecutorial role.

### b. Conspiracy

Another allegation which could constitute a transgression outside of Morris' prosecutorial duties involves a charge of conspiracy. Plaintiffs allege that Morris was engaged in a publicity campaign against child abuse and incest. Morris purportedly invented the Jordan sex ring in

---

jury witnesses, would constitute prosecutorial activities. *Marrero*, 625 F.2d at 505.

**13.** Norring is named as a defendant in *Lallak*.

**14.** The arrests of plaintiffs range from January 11, 1984, to June 4, 1984.

order to further the publicity campaign. Morris supposedly attempted to legitimize the existence of the sex ring by producing a large number of arrests and prosecutions for child sexual abuse. Plaintiffs claim that Morris recklessly sought out plaintiffs for arrest in full disregard of plaintiffs' rights. *See, e.g., Lallak* Complaint ¶ 29.

If Morris was directing a conspiracy to recklessly seek out plaintiffs for arrest, she would not be entitled to absolute immunity. In *Smith,* 744 F.2d 1354 (8th Cir.1984), a prosecutor had hired an individual to "get [the plaintiff] no matter what," including illegal means and through framing the plaintiff. *Smith,* 744 F.2d at 1364. The prosecutor also threatened the plaintiff, a deputy sheriff, with prosecution if the plaintiff attacked the sheriff's office during the plaintiff's discharge hearing. *Smith,* 744 F.2d at 1364. The Eighth Circuit concluded that these examples of the prosecutor's conduct were "more than sufficient" to establish that the prosecutor was acting beyond the scope of his prosecutorial duties. *Smith,* 744 F.2d at 1364.

Other cases indicate that a prosecutor's involvement in a conspiracy to coerce guilty pleas are actions outside the scope of prosecutorial duties. *Robichaud,* 351 F.2d at 537; *Lewis v. Brautigam,* 227 F.2d 124, 128–29 (5th Cir.1955). (The *Imbler* Court cited both *Robichaud* and *Lewis* as examples of acts of a prosecutor not entitled to absolute immunity. *Imbler,* 424 U.S. at 430 n. 30, 96 S.Ct. at 994 n. 30.) In *Lewis,* the prosecutor had allegedly ordered police officers to extort a guilty plea, which the police officers did through threats, intimidation, and promises of rewards directed at the plaintiff. The court concluded that if the prosecutor had in fact directed the police officers to conduct such activity, the prosecutor would not be entitled to absolute immunity. The *Robichaud* court similarly held that if a prosecutor directed police officers to intimidate a suspect into confessing, the prosecutor was acting as a police officer (*i.e.,* an investigator) and not in a prosecutorial capacity. *Robichaud,* 351 F.2d at 534, 537.

By contrast, if Morris simply did a bad job in deciding to charge plaintiffs, she is entitled to absolute immunity. Courts uniformly agree that a prosecutor is entitled to absolute immunity for failing to adequately investigate accusations against a defendant before charging the defendant. *Dick,* 551 F.Supp. at 992; *see also Henzel v. Gerstein,* 608 F.2d 654, 657 (5th Cir. 1979). Morris would also be protected by absolute immunity for basing her decision on whether or not to initiate charges against the plaintiffs on improper motives. *Jennings v. Shuman,* 567 F.2d 1213, 1221–22 (3d Cir.1977); *see also Imbler,* 424 U.S. at 422, 430–34, 96 S.Ct. at 991, 994–97 (decision to initiate proceedings is absolutely immune).

Yet, *Smith, Robichaud,* and *Lewis* involved something more than a prosecutor doing a bad job, making an improperly motivated decision to file charges, or presenting false evidence at trial. Those cases all involved prosecutors taking affirmative steps to fabricate a case against someone. Nevertheless, defendant Morris points to *Rose v. Koch,* 465 F.Supp. 1157, 1159–60 (E.D.N.Y.1979) for the proposition that a prosecutor's fabricating evidence is absolutely immune. The *Rose* court acknowledged that a prosecutor is absolutely immune for presenting false evidence at trial. *Rose,* 465 F.Supp. at 1159; *see also Butz,* 438 U.S. at 517, 98 S.Ct. at 2916. As far as the allegation that the defendants in *Rose* concocted and fabricated evidence by suborning perjury and otherwise, the *Rose* court simply stated that the plaintiff had not specifically alleged that the prosecutor defendants took part in those activities. *Rose,* 465 F.Supp. at 1160. The court indicated that such activities by prosecutors might have constituted investigative acts. *Rose,* 465 F.Supp. at 1160. *Rose,* therefore, does not stand for the proposition that a prosecutor is absolutely immune from charges of fabricating a case. Even if *Rose* stood for that proposition, the Eighth Circuit's decision in *Smith* would negate *Rose*'s precedential value.

If Morris really did orchestrate the fabrications of cases, she would have been acting in an investigatory role. Such allegations involve more than simply preparing witnesses for trial or doing the necessary investigation upon which to base a decision to file charges. *Smith, Robichaud,* and *Lewis* further indicate that if Morris directed police officers to fabricate evidence, then she would have been acting in an investigatory role.

### c. Destruction of Evidence

Plaintiffs additionally allege that Morris ordered the destruction of evidence in the criminal cases and that she personally destroyed evidence herself. Such acts, contend plaintiffs, are not protected by absolute immunity. No dispute exists that detective (and defendant) Norm Pint video taped an interview of the two oldest Myers children on May 22, 1984 at the scene of alleged child sexual abuse, the Quarry Camp Grounds, and that video tape was later erased. Defendant Morris points to four affidavits which state that the video tape contained nothing exculpatory in relation to charges against the Lallaks, Ranks, or Myerses. *E.g.,* Pint aff. ¶ VII; Morris aff. ¶ XXIII. Yet deputy sheriff (and plaintiff) Donald Buchan also viewed this tape and he concluded that the tape contained inconsistencies in allegations and a denial of certain accusations by the Myerses' eldest son. Buchan aff. ¶ 7. Thus, plaintiffs refer to this tape as exculpatory evidence.

Defendant Morris argues that she was never aware of the existence of this tape and that she never ordered its erasure. *See* Pint aff. ¶ VII. Defendant Morris asserts that assistant county attorney Gehl Tucker advised Pint that the tape would be of no value as evidence and thus Pint simply taped over portions of the tape. Pint aff. ¶ VII.

Another incident which plaintiffs label as the destruction of evidence surrounds Morris' 1984 appointment calendar. Morris' appointment calendar indicated when she interviewed child witnesses. Because Morris frequently did not make notes or reports of each interview, the calendar would have provided the only method to more accurately approximate how frequently Morris interviewed the children. Since plaintiffs claim that Morris interviewed the children an excessive number of times in order to brainwash or break the children, the number of interviews may be an important fact.

Morris admits that she discarded the 1984 calendar at the end of November, 1984. She states that this act was perfectly innocent because she always discards her calendar when she receives the calendar for the new year. Morris uses a calendar which contains the month of December for the current year as well as the twelve months of the upcoming year (*e.g.,* the 1985 calendar contains December of 1984). Thus, Morris concludes that her custom of discarding her calendar prior to the close of the year is not unusual. Morris aff. ¶ XXIV. Morris adds that it was not until after she had thrown her calendar away that she received a subpoena for it in connection with family court matters in December of 1984. Morris aff. ¶ XXIV.

Plaintiffs respond that destroying an appointment calendar instead of preserving it is quite unusual. Plaintiffs also reason that Morris logically would not have thrown away the calendar until the very end of November, or else she would not have had a calendar for a period of time. On November 20, 1984, the Lallaks served Morris with their complaint, a notice of motion for a nondestruct order, and a proposed nondestruct order. The proposed order forbade the destruction of relevant "documents" and the order explicitly defined "document" to include "calendars." The United States Magistrate did not sign this proposed order until December 10, 1984, but Morris should have been on notice from at least November 20, 1984 that plaintiffs wanted the calendar preserved. This date precedes the time when Morris would have, under her own rationale, logically discarded the calendar (*i.e.,* before her new calendar commenced in December).

At this juncture of the litigation, the Court cannot accept either defendant Mor-

ris' characterization of the video tape as nonexculpatory or her assertion that she did not order its destruction. *See Hartford Accident & Indemnity Co.*, 741 F.2d at 1144–45. Neither can the Court accept at this time, Morris' claim that she innocently discarded her calendar. *See Pfizer, Inc. v. International Rectifier Corp.*, 53? F.2d 180, 185 (8th Cir.1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977) (summary judgment is notoriously inappropriate when issue of intent is central).

While maintaining that the destruction of the tape and the calendar were both totally innocent, defendant Morris asserts that taken at their worst, these acts are still cloaked by absolute immunity. Defendant Morris relies on two Seventh Circuit cases for the proposition that the destruction of evidence is within the scope of prosecutorial duties and thus enjoys absolute immunity. *Hampton v. Hanrahan*, 600 F.2d 600, 633 (7th Cir.1979), *rev'd in part on other grounds*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (per curiam); *Heidelberg v. Hammer*, 577 F.2d 429, 432 (7th Cir.1978). Defendant Morris acknowledges cases to the contrary exist, but she implies that they are poorly reasoned.

*Hampton* and *Heidelberg*, however, do not analyze the issue of whether absolute immunity extends to the destruction of evidence, rather, they merely state a conclusion. *Wilkinson*, 484 F.Supp. at 1085 n. 31 (E.D.Pa.1980). *Wilkinson* is a very thoughtful opinion. The court points out that the destruction of evidence warrants different treatment from a prosecutor's decision not to turn over exculpatory evidence to the defense, or from a prosecutor not truthfully responding to a court's inquiry concerning the existence of exculpatory evidence. These latter two acts are protected by absolute immunity. These latter two acts, though, involve prosecutors making discretionary judgments, and absolute immunity prevents lawsuits challenging a prosecutor's judgments. They also involve the prosecutor's role as an advocate and are intimately involved in the judicial process. *Wilkinson*, 484 F.Supp. 1083–84.

By contrast, destroying evidence is not closely related to the judicial process, because it keeps evidence away from judicial scrutiny altogether. Unlike withholding evidence, destroying evidence forever eliminates the corrective process of judicial review based on the evidence. *Wilkinson*, 484 F.Supp. at 1083–84. Further, the destruction of evidence does not involve a prosecutor making discretionary decisions as an advocate. A lack of absolute immunity for prosecutors destroying evidence would not hinder prosecutors in making discretionary decisions because prosecutors could merely retain evidence for a reasonable time. *Wilkinson*, 484 F.Supp. at 1083–84.

The decision in *Henderson v. Fisher*, 631 F.2d 1115, 1120 (3d Cir.1980) (per curiam), also supports the conclusion that the destruction of evidence is not entitled to absolute immunity. In *Henderson*, the plaintiff alleged that the prosecutor knew a police officer had removed exculpatory evidence from a police evidence locker on the day of trial. As a result, the plaintiff did not have access to the evidence while presenting his criminal defense. The plaintiff did not allege that the prosecutor personally destroyed evidence, but only that the prosecutor failed to direct police officers to correct their action. *Henderson*, 631 F.2d at 1117. The court concluded that such action by the prosecutor was not entitled to absolute immunity. *Henderson*, 631 F.2d at 1120. The case law stating that the destruction of evidence is not entitled to absolute immunity has considerable persuasive force. Hence, Morris, at least at this juncture, cannot use absolute immunity to defeat such allegations.

In sum, a number of Morris' alleged transgressions involve acts which may be outside of her prosecutorial duties. Morris, therefore, cannot rely on absolute immunity at this time to defeat plaintiffs' lawsuits.

### 2. Qualified Immunity

█ If defendant Morris is not entitled to absolute prosecutorial immunity,

she can still assert the defense of qualified immunity. *See Imbler,* 424 U.S. at 430, 96 S.Ct. at 994. Even under the doctrine of qualified immunity, argues Morris, she is entitled to summary judgment before plaintiffs conduct discovery. Yet a defendant's assertion of qualified immunity can defeat a section 1983 action prior to discovery only if the plaintiff has not alleged that the defendant violated clearly established rights. The Court has previously determined that plaintiffs' allegations do involve violations of clearly established rights. No question exists, moreover, that plaintiffs' allegations assert that Morris herself violated their rights. Thus, qualified immunity does not entitle Morris to summary judgment at this stage of the litigation.

### B. Deputy Sheriffs

The following Scott County deputy sheriffs are defendants in the Scott County cases: Michael Busch and Patrick Morgan in *Myers, Lallak, Buchan, Meger,* and *Bentz;* Norman Pint in *Myers, Lallak, Buchan,* and *Bentz;* and David Einertson in *Lallak.*[15]

The Scott County Sheriff's Department became involved in the Jordan sex abuse cases in the fall of 1983. Defendant David Einertson, a detective sergeant in the department, was a complaining witness against James Rud in late October and early November of 1983. Einertson states that he had general supervisory responsibility over defendants Busch, Morgan, and Pint from October, 1983 until the dismissal of the Jordan sex ring cases in October, 1984. Einertson aff. ¶ II. Defendants Busch, Morgan, and Pint were extensively involved in the Jordan sex ring investigation. They conducted numerous interviews of alleged child sexual abuse victims, and were involved in the initiation of criminal charges and the separation of children from their parents.[16] The deputy sheriffs'

interviews with suspected child victims frequently formed the basis of the sexual abuse allegations against the adult plaintiffs.

Plaintiffs allege that the deputy sheriffs participated in the fabrication of accusations against the adult plaintiffs. Purportedly, the deputy sheriffs conducted coercive interviews of the children in order to produce incriminating statements. Plaintiffs further claim that the deputy sheriffs, either personally or in concert with other defendants, caused the improper arrests of the adult plaintiffs and the separations of plaintiffs' families.

 The deputy sheriffs deny having committed any wrongdoing. They argue, moreover, that they could not be liable to plaintiffs even if plaintiffs' allegations were true. The deputy sheriffs base this conclusion on two legal arguments which the Court has previously discussed. Initially, the deputy sheriffs reason that their actions did not cause the arrests or separations of families because independent judicial officers determined that probable cause existed for the arrests and the separations. These independent judicial determinations, according to the deputy sheriffs, broke the chain of causation between their conduct and the resulting arrests and separations. Probable cause determinations by independent judicial officers, however, do not insulate the deputy sheriffs from liability if the deputy sheriffs, as alleged, deceived the independent judicial officers. A law enforcement officer who intentionally misleads a judicial officer should not escape section 1983 liability simply because the deception was successful. *See Rodriguez v. Ritchey,* 556 F.2d 1185, 1195 (5th Cir.1977) (en banc) (Hill, J., concurring); *see also Ames v. United States,* 600 F.2d 183, 185 (8th Cir.1979).

 The deputy sheriffs also argue that they are entitled to summary judg-

---

**15.** The Court will occasionally refer to these defendants collectively as the "deputy sheriffs."

**16.** Defendant Busch swore to criminal complaints against the Browns, Lallaks, Myerses, and Ranks. (The Browns and the Ranks have

not named any Scott County deputy sheriffs as defendants.) Both defendant Morgan and Pint swore to separate criminal complaints against the Bentzes.

ment on the basis of qualified immunity. Qualified immunity will protect these defendants from liability if they merely made a mistake in assessing whether probable cause existed, *see, e.g., Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967); *Smiddy v. Varney,* 665 F.2d 261, 266 (9th Cir.1981), *cert. denied,* 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982), or if they merely acted in good faith reliance on court orders. *E.g., Tymiak v. Omodt,* 676 F.2d 306, 308 (8th Cir.1982) (per curiam). Yet the deputy sheriffs' purported transgressions go well beyond simple mistakes; plaintiffs accuse them of reckless disregard of plaintiffs' rights. Furthermore, the deputy sheriffs' alleged misconduct involves the violation of clearly established rights, and thus they cannot obtain summary judgment before plaintiffs have had the opportunity to conduct discovery. *See, e.g., Mitchell v. Forsyth,* —— U.S. ——, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985); *Hobson v. Wilson,* 737 F.2d 1, 26–27 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). In sum, granting the deputy sheriffs summary judgment prior to determining precisely what their conduct was, would be inappropriate. *See Beard v. Udall,* 648 F.2d 1264, 1272 (9th Cir.1981) (per curiam).

### C. Sheriff Tietz

Scott County Sheriff Douglas Tietz is a defendant in *Myers, Lallak,* and *Buchan.* As chief law enforcement officer for the county, *see* Minn.Stat. § 387.03, a sheriff is responsible for the actions of the deputy sheriffs. Minn.Stat. § 387.14. The plaintiffs who name Tietz as a defendant do not accuse him of personally engaging in acts such as improperly interviewing witnesses, but they do claim that Tietz was grossly negligent in training and supervising the deputy sheriffs involved in the Jordan sex ring investigation. Plaintiffs allege, inter alia, that Tietz allowed the deputy sheriffs to work under the direction of Morris, and that he failed to prevent the deputy sheriffs from committing transgressions which he either knew or should have known were occurring.

Defendant Tietz argues that even if these allegations were true, he cannot be subjected to section 1983 liability because the allegations rely on the doctrine of respondeat superior. Under section 1983, a supervisory official cannot be vicariously liable for the acts of subordinates based on the doctrine of respondeat superior. *See Monell v. New York City Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Jennings v. Davis,* 476 F.2d 1271, 1274 (8th Cir.1973). Nevertheless, plaintiffs can still conceivably recover against defendant Tietz because their allegations that Tietz improperly trained and supervised the deputy sheriffs are not founded on respondeat superior. Rather, these accusations seek to hold Tietz directly liable for his own failures. *See Herrera v. Valentine,* 653 F.2d 1220, 1224 (8th Cir.1981). Officials can be liable under section 1983 for improper training or supervision of subordinate law enforcement officers. *See Herrera,* 653 F.2d at 1224; *Pearl v. Dobbs,* 649 F.2d 608, 609 (8th Cir.1981) (per curiam).

In order to prevail on a claim of improper training, a plaintiff must prove that a defendant deliberately chose a training program which would prove inadequate. *City of Oklahoma City v. Tuttle,* —— U.S. ——, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (Rehnquist, J., plurality). A policy of inadequate training, however, cannot be inferred from a single incident of police misconduct. *Tuttle,* 105 S.Ct. at 2436–37 (Rehnquist, J., plurality), 2440 (Brennan, J. concurring). Still, a plaintiff can establish a policy of inadequate training, as well as a policy of deficient supervision, by direct evidence regarding those practices. *See Tuttle,* 105 S.Ct. at 2437–38, 2439–40 (Brennan, J., concurring). A plaintiff can also hold a defendant liable for deficient supervision by demonstrating that the defendant failed to respond to a known pattern of subordinate misconduct. *See Baker v. McCoy,* 739 F.2d 381, 384 (8th Cir.1984); *Herrera,* 653 F.2d at 1224.

Here, plaintiffs are alleging that the deputy sheriffs were committing repeated acts of misconduct, and that Tietz should have rectified the situation. If the deputies were acting improperly, Tietz does have a statutory obligation to take corrective measures. *See* Minn.Stat. § 387.14 (sheriff responsible for actions of deputies). In addition, plaintiffs' accusation that Tietz was aware of repeated transgressions is plausible considering the deputy sheriffs' extensive involvement in the Jordan sex ring investigation. Plaintiffs, therefore, are entitled to attempt to develop evidence which would bear on the adequacy of defendant Tietz' supervision and training of the deputy sheriffs.[17]

Even if plaintiffs could prove that he had a policy of improperly training or supervising the deputy sheriffs, argues defendant Tietz, plaintiffs could not establish that such a policy caused the violations of plaintiffs' rights. Tietz thus concludes that he is entitled to summary judgment at this juncture. Of course, plaintiffs will ultimately have to show "an affirmative link between" any Tietz policy and the violations of plaintiffs' rights. *E.g., Tuttle,* 105 S.Ct. at 2436 (Rehnquist, J., plurality). On a summary judgment motion, however, especially one made before discovery has commenced, the Court cannot conclude that a Tietz policy could not have caused violations of plaintiffs' rights. *See, e.g., Hartford Accident & Indemnity Co. v. Stauffer Chemical Co.,* 741 F.2d 1141, 1144–45 (8th Cir.1984) (court must view facts in light most favorable to party resisting summary judgment). The Court, therefore, denied defendant Tietz' motion.

---

**17.** Although defendant Tietz did not argue that he has no responsibility for training the deputy sheriffs, the Jordan City Police Department asserted that local law enforcement departments and officials have no duty to train police officers because the Minnesota Board of Peace Officer Standards and Training (hereafter Training Board) has sole responsibility for that function. Minn.Stat. §§ 626.843–845 does give the Training Board the tasks of, inter alia, certifying police officers training programs and licensing police officers. *See* Minn.Stat. § 626.845, subd. 1(a) & (d). The Training Board's responsibilities for training police officers, however, does

## D. Human Services Department

The Scott County Human Services Department (HSD) (also referred to as the welfare department) is a defendant in *Myers, Lallak, Buchan, Meger, Bentz,* and *Brown.* Former director of HSD Margaret Subby, and social worker Doris Wilker are defendants in *Myers, Buchan, Meger, Bentz,* and *Brown.* Social workers Mary Tafs and Judy Dean are defendants in *Buchan;* social worker Rachel Paff is a defendant in *Lallak;* and Joel Kaufman, a psychologist formerly employed by HSD, is a defendant in *Meger.*[18]

In October of 1983, shortly after the September 26, 1983 arrest of James Rud, County Attorney Morris approached HSD Director Subby to discuss suspected child abuse in Scott County. Subby aff. ¶ IV. Morris requested that HSD social workers be present during law enforcement officers' interviews of suspected child abuse victims. Subby aff. ¶ V. During the ensuing Jordan sex ring investigation, various social workers would accompany officers to interviews of children. The HSD defendants state that the social worker's role at an interview was to provide emotional support to the children. The HSD defendants admit, however, that the social workers would "on occasion" assist in the interviews. The HSD defendants state that social workers would provide such assistance when a police officer "faltered or became uncomfortable with the discussion." Also, if a child had difficulty understanding a question, the social workers would assist in the interview. All HSD defendants in-

---

not mean that local law enforcement departments and officials have no responsibilities for training. *See* Minn.Stat. § 626.845, subd. 1(f) (Training Board to consult with local law enforcement departments in developing in-service training programs for peace officers). Thus, plaintiffs can assert improper training allegations against defendant Tietz.

**18.** The Court will occasionally refer to these defendants collectively as the "HSD defendants."

volved in interviews stress that they did not coerce the child witnesses.

The interviews in which the social workers participated included at least some sessions prior to the arrest of adult plaintiffs and the removal of children. Wilker, for example, was present at interviews of the Brown children prior to the January 11, 1984 arrest of Thomas and Helen Brown. (The Brown children were also separated from their parents that day.) *See* Wilker aff. ¶ XLII. In addition, Wilker participated in interviews of Chris Brown's [19] three children on January 10 and 11, 1984. Hunter aff., exh. Brown 1–2. The interviews of Chris Brown's children formed the basis for arresting Thomas and Helen Brown and removing their children from them. Norring April 30, 1985 aff. ¶ 15.

Wilker states that she did not suggest, recommend, or even participate in the decision to arrest the Browns and separate them from their children. Wilker aff. ¶ XLIV. The other HSD defendants similarly declare that they had no role in such decisions. Paff aff. ¶ XI, Tafs aff. ¶ VIII, Dean aff. ¶ XIX, Kaufman aff. ¶ VI. Director Subby states that HSD itself did not make any recommendations or take any action in the process of charging adult plaintiffs or deciding to remove children from their parents. Subby aff. ¶ VII. Subby believes that all such decisions were made by the county attorney's office and/or law enforcement officials. Subby aff. ¶ VII.

When law enforcement officers actually separated the children from their parents, a social worker was present to provide support to the children.[20] Following the separation, the social workers would arrange for temporary foster care of the children. In the meantime, the county attorney's office would prepare a neglect petition for the family court. A social worker would,

on behalf of HSD, sign the document as the petitioner.[21] Morris also signed each petition, indicating that the petition was prepared on her recommendation and approval.

All of the neglect hearings involving plaintiffs resulted in court orders finding probable cause of neglect and providing for family court custody of the children. Subsequently, the children were placed in foster homes. The social workers provided support to the foster parents, and monitored and supervised the foster parents' relationships with the children. Social workers also continued to be present at various interviews in which law enforcement officers questioned the children.

Also, interviews following the separation of children and parents could have played a role in formulating accusations against some of the adult plaintiffs. For instance, defendant Wilker was not present at any interviews of the Myers children prior to Greg Myers' arrest and the removal of the Myers children, both events occurring on February 6, 1984. *See* Wilker aff. ¶ XIX. Wilker was, however, present during interviews of the Myers children after this time. *See* Wilker aff. ¶ XXIII. Accusations made by the Myers children later formed the basis for, inter alia, the May 23, 1985 arrest of Jane Myers and the arrests on June 4, 1984 of the Buchans. Wilker acknowledges that she was present at interviews of the Myers children prior to the arrests of Jane Myers and the Buchans, yet she claims she did not participate in the questioning of the Myers children. Wilker aff. ¶ XXIII. Plaintiffs point out, however, that in the family court proceeding regarding the Myers children, Wilker testified that on some occasions she had questioned children in order to develop evidence for trial. *In re Myers Children*, Family Court Transcript Excerpt, at 89. Wilker added

---

**19.** Chris Brown is Helen Brown's sister.

**20.** Wilker was present at the removal of the Brown, Bentz, Myers, and Buchan children. Paff was present at the removal of the Brown and Bentz children. Tafs was present at the removal of the Bentz children.

**21.** Wilker signed neglect petitions regarding the children of the Browns, Myerses, and Buchans. Paff signed the Bentz neglect petition.

that she only asked questions at the request of the guardian at litem. *Id.*

Defendant Wilker appears to be the social worker most heavily involved with purported child abuse victims. Wilker signed neglect petitions and was present during numerous interviews of child witnesses. Wilker also served as a liason between HSD and law enforcement officials and worked out of the county attorney's office for a period of time. Wilker aff. ¶ XVI. Additionally, Wilker was involved with the supposed voluntary placement of the Meger children. Counsel for the HSD defendants conceded at oral argument that an issue of fact exists regarding the voluntariness of Wanda Meger's assent to the placement.

Defendant Paffs seems to have played a less extensive role. The HSD defendants state that Paff, a defendant only in *Lallak,* participated in interviews on the same basis as Wilker. Paff acknowledges being present at a February, 1984 interview of the Lallaks' daughter, but she states that this was her only contact with the Lallak children. Paff aff. ¶ VII, X. (The Lallaks were arrested on May 23, 1984, but county officials never obtained custody of the children because the children were out of the jurisdiction.)

Defendants Tafs and Dean are defendants only in *Buchan,* and they both state that all their contact with the Buchan children was in the context of monitoring and supervising foster care of the children. Tafs and Dean add that they performed their duties relating to foster care within family court guidelines and at the direction of guardians ad litem. Tafs aff. ¶ XXXVI; Dean aff. ¶ XX. Tafs acknowledges attending some child interviews, but Dean indicates that her only dealings with alleged victims related to monitoring foster care.

Finally, former HSD psychologist Kaufman is a defendant only in *Meger.* Defendant Kaufman acknowledges that he provided psychological services to the Meger children and to the parents prior to the separation of the Meger family. *See* Kaufman aff. ¶¶ VIII–X. Kaufman, however, denies manipulating the children into giving false or misleading information. Kaufman ¶ XIV.

Plaintiffs assert that HSD employees acted in concert with the other defendants in developing accusations against the adult plaintiffs in reckless disregard of the truth. Plaintiffs further assert that the actions of the HSD defendants contributed to initial separation of the parents and children. Moreover, plaintiffs maintain that the actions of these defendants contributed to the continued separation of parents from their children. The HSD defendants purportedly accomplished this result by withholding exculpatory evidence (*e.g.,* children's denials that adults sexually abused them) and participating in interviews which caused the children to make the accusations which the questioners sought. Plaintiffs further allege that the HSD defendants contravened various state statutes and regulations dealing with social workers and the handling of child sexual abuse accusations.

### 1. Viability of Claims

The HSD defendants assert that they are entitled to summary judgment because plaintiffs have not alleged that the HSD defendants deprived plaintiffs of federally protected rights. Of course, to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that the defendant's conduct deprived plaintiff of a right, privilege, or immunity protected by the federal Constitution or federal law. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). The Court will next examine what federally protected rights the HSD defendants may have impinged.

### a. Fourth Amendment

█ Plaintiffs have alleged that the social workers were part of a conspiracy to develop, in reckless disregard of the truth, accusations which led to the arrests of plaintiffs. A significant means for developing accusations, assert plaintiffs, was the interviews of children in which the interviewers would cause the children to give

the desired responses. The HSD defendants respond that even if plaintiffs' fourth amendment rights were violated, the HSD defendants are not responsible. These defendants state that the investigation leading to the arrest of various plaintiffs was conducted by law enforcement officials and not HSD. The HSD defendants stress that the determinations to arrest adults were made by the county attorney's office and law enforcement officers. According to the HSD defendants, the social workers did not make any recommendations or influence in any way the arrest decisions.

While the HSD defendants claim that they did not play a "major" role in the investigations leading up to the arrests of plaintiffs, they do not deny that they did play a role. The HSD defendants acknowledge that they aided in questioning children regarding possible sexual abuse, but they state that their participation was minimal.

The HSD defendants' admitted presence and participation in at least some interviews prior to plaintiffs' arrests, indicates that these defendants had the opportunity to commit the transgressions which plaintiffs allege. Defendants state that they did nothing improper and that they did not influence arrest decisions in any way. This could well be true. At this juncture, however, the Court should not simply accept defendants version of the facts, *e.g., Hartford Accident & Indemnity Co. v. Stauffer Chemical Co.*, 741 F.2d 1142, 1144–45 (8th Cir.1984). If the HSD defendants participated in recklessly developing accusations against plaintiffs, then the HSD defendants could be liable even if the county attorney or a judicial officer made the determination to arrest plaintiffs. *Dick v. Watonwan County*, 551 F.Supp. 983, 993 (D.Minn.1982); *see also Wheeler v. Cosden Oil and Chemical Co.*, 734 F.2d, 254, 260 (5th Cir.) (discussing malicious prosecution), *mod. on other grounds*, 744 F.2d 1131 (1984).

**b. Liberty Interest**

 Defendants do not dispute that plaintiffs have a protected liberty interest under the fourteenth amendment in keeping their family units together. *E.g., Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir.1977). The HSD defendants contend, however, that plaintiffs have not stated a cause of action against them for intruding on this liberty interest. The HSD defendants reason that the procedures in the family court provided plaintiffs all the process that was due in connection with the removal of plaintiffs' children, but the Court has previously rejected this analysis.

The HSD defendants also assert that they are entitled to summary judgment because they took no part in the decision to remove the children from the parents. The Court does not accept this argument for reasons similar to the rationale for rejecting the HSD defendants' claims that they had nothing to do with causing plaintiffs' arrests. The HSD defendants acknowledge that they took part in at least some interviews prior to the children's removal. In addition, a social worker was on the scene when law enforcement officials actually removed children. Social workers were also the complainants on the neglect petitions. Thus, the HSD defendants had the opportunity to influence and recommend removal of the children. The HSD defendants' contention that they did not actually exercise any influence in the removal decisions, while it may well be true, should not be accepted by the Court at this point.

Even if the HSD defendants did not participate in the actual decision making process leading to the separation of children from their parents, they still could have contributed to the separations. The HSD defendants allegedly took part in fabricating accusations by the children, and these accusations ultimately led to the initial separation of the families. Thus, the HSD defendants' alleged aiding in the creation of charges, by itself, could have contribut-

ed to the separation of children from adults. HSD defendants also were involved in child interviews after the children were separated from their parents. Through such interviews, plaintiffs claim that the HSD defendants participated in further attempts to create accusations and suppression of exculpatory evidence. If true, such acts could have contributed to the continuing separation of the plaintiffs' families. Thus, the HSD defendants could have impinged upon plaintiffs' liberty interests.

### c. State Statutes and Regulations

In addition to asserting that the HSD defendants infringed upon their fourth amendment rights and their liberty interests in family integrity, plaintiffs assert that defendants violated rights created by state statutes and regulations. For instance, plaintiffs claim the HSD defendants failed to give the plaintiffs Tennessen warnings. Minn.Stat. § 13.04, subd. 2. This warning is part of the Government Data Practices Act, Minn.Stat. §§ 13.-01–.88, and it requires social workers to, inter alia, inform interviewees whether they may refuse to answer questions and why information is being sought. Another statute allegedly violated was Minn.Stat. § 626.556, subd. 10(a) which directs the local welfare agency to immediately assess reports of child abuse. That statute further provides that in dealing with child abuse, the local welfare agency shall preserve the family whenever possible. The plaintiffs also claim that the HSD defendants contravened Minn.Rules § 9560.0280, subp. 2E which mandates that before children are removed from their parents, the parents must have an opportunity to voluntarily place the child in a safe setting (e.g., with a relative).

The HSD defendants acknowledge that social workers traditionally attempt to resolve problems of child abuse with the entire family, but they state that the Jordan

sex ring cases were not traditional. Most court orders and bail bonds, point out the HSD defendants, prohibited contact between parents and children. This prohibition, however, would not prevent social workers from providing parents the chance to voluntarily place their children, nor would it completely prevent social workers from working with parents.

Nevertheless, the HSD defendants maintain that even if they violated state statutes and regulations, such violations are not actionable under section 1983. The HSD defendants rely on *Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979), which held that because section 1983 imposes liability only for transgressions of rights protected by the Constitution, violations of state tort law are not actionable under the statute. Defendants reason that similarly, violations of state laws and regulations cannot form the basis for recovery under section 1983.[22]

■■■ A cause of action exists under section 1983 only for violations of rights, privileges, or immunities protected by the federal Constitution or federal law. *E.g., Parratt*, 451 U.S. at 535, 101 S.Ct. at 1912. Rights guaranteed by state statutes and regulations, however, can create constitutionally-protected interests which may not be denied without due process. *Joseph A. v. New Mexico Department of Human Services*, 575 F.Supp. 346, 354 (D.N.M. 1983), *citing Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *cf. Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). In fact, *Doe v. Hennepin County*, Civ. 4–84–115, slip op. at 11–14 (D.Minn. June 26, 1984), found that alleged violations of some of the same state statutes and regulations involved in the Scott County cases were actionable under section 1983. The plaintiffs in *Doe* alleged that when the defendants removed plaintiffs' children based on accusations of child abuse, the defendants disregarded the pro-

---

**22.** The HSD defendants also argue that violations of state statutes and regulations are irrelevant to their entitlement to qualified immunity.

The Court will address this contention in its discussion of the HSD defendants and qualified immunity.

visions of Minn.Stat. § 626.556, subd. 10 and its corresponding regulations. 12 M.C. A.R. § 2.207, *recodified as* Minn.Rules. § 9560.0280, subp. 2-4. In *Doe,* the social worker defendants moved for summary judgment at an early stage in the litigation, but the court denied their motion. The court reasoned that factual disputes existed over issues such as whether the welfare agency immediately investigated the charges and whether it attempted to preserve the family as required by statute. *Doe,* slip op. at 13-14. Thus, the HSD defendants' purported violations of state statutes and regulations is conduct actionable under section 1983.[23]

### 2. Immunity Defenses

The HSD defendants also claim that they are entitled to dismissal on the basis of both absolute and qualified immunity.

### a. Absolute Immunity

■ The HSD defendants assert that as social workers involved in the handling of sexual abuse cases, they are protected by absolute immunity from section 1983 liability. To support this contention, they rely on *Kurzawa v. Mueller,* 732 F.2d 1456 (6th Cir.1984), and *Whelehan v. County of Monroe,* 558 F.Supp. 1093 (W.D.N.Y.1983). Both of these cases held that social workers investigating sexual abuse allegations were absolutely immune. These courts reasoned that social workers should enjoy absolute immunity because otherwise they faced the constant threat of retaliatory lawsuits brought by disgruntled parents.

*Kurzawa,* 732 F.2d at 1458; *Whelehan,* 558 F.Supp. at 1098-99.[24]

This proposition, however, is contrary to the majority of case law.[25] *Doe v. Hennepin County,* slip op. at 15, *citing Joseph A.,* 575 F.Supp. 346 (D.N.M.1983); *Dick,* 551 F.Supp. 983 (D.Minn.1982); *Mattson v. Bankole,* CIV. 4-83-113, slip op. (D.Minn. May 27, 1982); *Doe v. Suffolk,* 494 F.Supp. 179 (E.D.N.Y.1980). The argument that social workers need protection from lawsuits can also be made on behalf of police officers, because police officers have a similar potential for becoming defendants in actions commenced by the individuals they arrest. Still, police officers are not cloaked by absolute immunity. *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). The Supreme Court has declared, moreover, that courts cannot create new forms[26] of absolute immunity under section 1983 because certain officials need protection from the constant threat of retaliatory litigation. *See Tower v. Glover,* 467 U.S. 914, 104 S.Ct. 2820, 2826, 81 L.Ed.2d 758 (1984). If sound policy reasons exist for establishing new forms of absolute immunity, Congress, not the courts, must do so. *Tower,* 104 S.Ct. at 2826.

The HSD defendants, however, also seek to invoke an established basis for absolute immunity under section 1983. They reason that because they were assisting a county attorney in determining whether or not to initiate prosecutions, they are entitled to prosecutorial immunity. The HSD defendants rely on *Lawyer v. Kernodle,* 721 F.2d

**23.** Some plaintiffs further argue that because many state regulations dealing with handling child abuse charges were adopted according to federal law, Title IV-E of the Social Security Act, 42 U.S.C. § 670-676, violations of the regulations implicate federal law as well. *See* 42 U.S.C. §§ 671(a)(15), 672(a), 675; 45 C.F.R. §§ 1355-57; *Lynch v. Dukakis,* 719 F.2d 504, 510-11 (1st Cir.1983) (violations of Title IV-E of the Social Security Act, 42 U.S.C. §§ 670-76, actionable under section 1983). The Court finds it unnecessary to reach this argument.

**24.** *Whelehan* also reasoned that social workers act like prosecutors when they decide to initiate sexual abuse charges and remove children from

their parents. *Whelehan,* 558 F.Supp. at 1099. Here the HSD defendants state they played no such role.

**25.** In the discussion of the noncourt appointed therapist defendant, the Court specifically addresses *Kurzawa's* statements that noncourt appointed officials are entitled to absolute immunity.

**26.** The absolute immunities which the Supreme Court has recognized under section 1983 are immunities based on those which existed when the Civil Rights Act was passed in 1871. *Tower,* 104 S.Ct. at 2825.

632 (8th Cir.1983), which held that a doctor who was accused of negligently performing an autopsy was absolutely immune. Because the information the doctor generated was to be used by the prosecutor to determine whether or not to file charges, the doctor was entitled to the same immunity as a prosecutor. *Lawyer*, 721 F.2d at 636. The HSD defendants state that they played a similar role in the Jordan sex ring cases. In *Lawyer*, the plaintiff had alleged only that the doctor was negligent in performing the autopsy, while here plaintiffs allege that defendants acted with reckless indifference to plaintiffs' rights. More importantly, the Court has previously concluded that defendant Morris might have acted beyond her prosecutorial role. Thus, the HSD defendants will not be able to derive prosecutorial immunity from their assistance of Morris if Morris was acting beyond her prosecutorial functions. The HSD defendants, therefore cannot prevail on the basis of absolute immunity.

**b. Qualified Immunity**

 The HSD defendants also contend that qualified immunity entitles them to summary judgment at this juncture. These defendants initially argue that their purported violations of state statutes and regulations cannot defeat their claim to qualified immunity. In *Davis v. Scherer*, ── U.S. ──, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984), the Supreme Court held that "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." If a defendant violates a statute or regulation irrelevant to the plaintiff's underlying constitutional claim, the defendant will not forfeit the defense of qualified immunity. *See Davis*, 104 S.Ct. at 3018. On the other hand, when a defendant's violation of a state statute or regulation is itself part of a plaintiff's cause of action, the violation may strip a defendant of the qualified im-

munity defense.[27] *See Davis*, 104 S.Ct. at 3020 n. 12.

 Here, the HSD defendants' purported violations, if true, do give rise to a cause of action under section 1983. The state laws and regulations the HSD defendants allegedly contravened concerned proper steps associated with the removal of children from their parents, and these transgressions are central to plaintiffs' constitutional claims. The *Davis* Court, in fact, indicated that if state law created procedural rules which govern what process is due under the fourteenth amendment, then violations of such rules would strip a defendant of qualified immunity. *See Davis*, 104 S.Ct. at 3019 n. 11. Thus, if the HSD defendants actually violated Minnesota statutes and regulations dealing with child removal, they would not be entitled to qualified immunity.[28]

Irrespective of violations of state statutes and regulations, the HSD defendants cannot prevail on the basis of qualified immunity. As the Court has previously stated, plaintiffs are asserting violations of clearly established rights, and they are thus entitled to conduct discovery. Some of the individual HSD defendants, though, appear to have played a minor role in the Jordan sex ring cases. For instance, social workers Tafs and Dean are defendants only in *Buchan*, and they state that their contact with the Buchan children was entirely in the context of monitoring and supervising foster care of the children. They stress that they performed their duties relating to foster care within family court guidelines and at the direction of guardians ad litem. The family court did direct HSD to place the Buchan children in foster homes, *In re Buchan Children*, June 7, 1984 Order, at 2; *see also In re Buchan Children*, Nov. 15, 1984 Order, at 2. If Tafs' and Deans' activities relating to *Buchan* were solely actions taken in good faith reliance on court orders, then these defendants will prevail on the basis of qual-

---

**27.** This assumes the defendant is violating clearly established law.

**28.** A reasonable social worker, of course, would be aware of these relevant statutes and regulations.

ified immunity. *E.g., Tymiak v. Omodt,* 676 F.2d 306, 308 (8th Cir.1982) (per curiam). The Court, however, is not at present in a position to conclude that Tafs and Dean's role was limited to good faith reliance on court orders.

### 3. Human Services Department

 The Human Services Department, as an agency of Scott County, cannot raise a qualified immunity defense. *See Owen v. City of Independence,* 445 U.S. 622, 650, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980). On the other hand, the HSD is not liable for the acts of its employees under the doctrine of respondeat superior. *Monell v. New York City Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). The HSD would be liable if an affirmative link existed between its policies or customs and the alleged violation of plaintiffs' rights. *City of Oklahoma City v. Tuttle,* — U.S. —, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (Rehnquist, J., plurality); *see also Monell,* 436 U.S. at 694, 98 S.Ct. at 2037.

Plaintiffs do assert that policies and customs of the HSD caused violations of plaintiffs' constitutional rights. For example, plaintiffs claim that HSD had a policy of not working to reunite the family, whenever possible, which would be in direct contravention of a stated statutory goal. Minn.Stat. § 626.556, subd. 10. The Court should not merely accept the HSD's claim that it had no improper policies or customs because discovery could yield evidence to the contrary. Plaintiffs are also entitled to attempt to establish an affirmative link between an HSD policy or custom and violations of plaintiffs' rights. Accordingly, the Court denied HSD's motion for summary judgment.

### E. Scott County Defendants

Scott County, the political entity, is a defendant in all Scott County cases, while the Scott County Board of Commissioners (hereafter Board) is a defendant in only *Lallak.* The Board was also a defendant in *Meger,* but the Megers dismissed their claims against the Board without prejudice. The sole case to name individual members of the Board as defendants was *Rank,* but the Ranks have dismissed without prejudice their claims against individual board members.

 Under section 1983, respondeat superior is not a basis for holding the Board or Scott County liable. *See Monell v. New York City Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). "Instead, it is when execution of a [local] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037. An affirmative link must exist between the policy or custom and the violation of constitutional rights. *City of Oklahoma City v. Tuttle,* — U.S. —, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (Rehnquist, J., plurality). Unlike individual officials, the Board and Scott County cannot raise the defense of qualified immunity, *see Owen v. City of Independence,* 445 U.S. 622, 650, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980); *Dick v. Watonwan County,* 562 F.2d 1083, 1103 (D.Minn.1983), *rev'd in part on other grounds,* 738 F.2d 939 (8th Cir.1984), nor can they be liable for punitive damages. *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981).

### 1. Board of Commissioners

Board chairman Dick Mertz indicates that the Board did not have any direct involvement in the Jordan sex ring investigation. Mertz acknowledges that the Board generally knew of various criminal arrests and family court proceedings regarding alleged child sex abuse. Mertz aff. ¶ 8, 13. According to Mertz, though, the Board was not informed on any specific details of investigations, criminal charges, or family court proceedings. Mertz aff. ¶ 5, 14. In fact, Mertz states that the Board did not have direct or indirect in-

volvement in the investigation or prosecution of criminal or family court matters. Mertz aff. ¶ 11. At no time, claims Mertz, did the Board establish or attempt to establish any policy, procedure, practice, or custom for the county, the county attorney's office, the county sheriff's office, or the county human services department (HSD) regarding the sexual abuse cases. Mertz aff. ¶ 12. In June of 1984, the Board did provide the county attorney's office and the HSD with additional personnel and office space because of the increased demands associated with ensuing sexual abuse trials. Mertz aff. ¶ 5.

The Lallaks make much of the Board's approval of these additional funds, stating that the amount far exceeded any previous allocations and included huge overtime costs. The Board's approval of the increased funds, conclude the Lallaks, indicates that the Board was not completely oblivious to the investigatory techniques being employed. By providing these funds, the Board supposedly sanctioned and encouraged the county attorney and the sheriff. Thus, the Lallaks argue that the Board is liable to them because it created a policy of nonintervention and deliberate indifference toward the methods used by all the various Scott County departments involved in the investigation.

To support their contention, the Lallaks point to *Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980), which held that a municipality can promulgate an official policy within the meaning of *Monell*, by implicitly or tacitly authorizing, approving, or encouraging misconduct. *See also Herrera v. Valentine*, 653 F.2d 1220, 1224 (8th Cir.1981). The *Turpin* court gave the example of senior personnel having knowledge of their subordinates committing a pattern of unconstitutional acts, and doing nothing to correct the misconduct. If the senior personnel's failure to take remedial measures constituted deliberate indifference or tacit approval of

the misconduct, a municipality could be held liable for subsequently occurring misconduct. *Turpin*, 619 F.2d at 201. *See also Parnell v. Waldrep*, 538 F.Supp. 1203, 1205 (W.D.N.C.1982) (county and its board liable under section 1983 because they were aware of unconstitutional prison conditions and failed to rectify them). *Turpin*'s rationale has been embraced by the Eighth Circuit. *See Herrera*, 653 F.2d at 1224, *citing Turpin*. One incident of subordinate misconduct, however, is an insufficient basis for inferring a municipal policy. *Tuttle*, 105 S.Ct. at 2436-37 (Rehnquist, J., plurality), 2440 (Brennan, J., concurring).

In the present actions, however, the Board was not in a position to correct patterns of misconduct in the county attorney's office, the sheriff's department, or the HSD. The Board cannot dictate the policies of the county attorney or the county sheriff because these two individuals are independently elected and derive their powers to conduct county affairs from state statutes. *See* Minn.Stat. §§ 388.01–.22 (county attorney) and §§ 387.01–.45 (sheriff). In addition, the Scott County Human Services Board, and not the County Board, established policies for HSD. *See* Mertz aff. ¶ 9; Human Services Act, Minn.Stat. §§ 402.01–.10. Because the Board was not in a position to rectify transgressions of these three departments, the Board cannot be liable for failing to take corrective measures. *See Anderson v. Nosser*, 438 F.2d 183, 199 (5th Cir.1971), *mod. on other grounds*, 456 F.2d 835 (en banc), *cert. denied*, 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972). Neither can the Board be subjected to liability for approving additional funding for the HSD and the county attorney's office. Funding facially legitimate budgetary requests cannot constitute approval of unconstitutional policies. Thus, summary judgment is warranted for the Board.[29]

### 2. Scott County

The Court's conclusion that the Board is entitled to summary judgment

---

29. As a practical matter, granting the Board's summary judgment motion does not harm the

Lallaks because Scott County itself remains a defendant in the case.

does not automatically lead to the same result for the summary judgment motion of Scott County (hereafter County) itself. In addition to measures taken by its board of commissioners, a county acts through its high level officials. *See, e.g., Bowen v. Watkins,* 669 F.2d 979, 989 (5th Cir.1982); *Leite v. City of Providence,* 463 F.Supp. 585, 589 (D.R.I.1978). In holding that a municipality could be held liable under section 1983 only on the basis of a municipal policy or custom, the *Monell* Court indicated that potential sources for such policies or customs were municipal "lawmakers or ... those whose edicts or acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037. A policy which can be attributed to a municipal policy maker constitutes a municipal policy under section 1983. *Tuttle,* 105 S.Ct. at 2436 (Rehnquist, J., plurality).

■ In *Sanders v. St. Louis County,* 724 F.2d 665, 668 (8th Cir.1983) (per curiam), the Eighth Circuit stated that "[i]t may be that one act of a senior county official is enough to establish the liability of the county, if that official was in a position to establish policy and if that official himself directly violated another's constitutional rights." The issue of when a governmental official's actions constitute a municipal policy or custom is a hotly contested topic in this circuit. *See Williams v. Butler,* 746 F.2d 431, 438 (8th Cir.1984), *aff'd by an equally divided court,* 762 F.2d 73 (1985) (en banc). Two views of what constitutes a municipal policy appear to have developed, but both views acknowledge that individual officials can make policies or customs which can subject municipalities to section 1983 liability if the officials act pursuant to their policymaking authority. *See Williams,* 746 F.2d at 444 (McMillian, J., dissenting).

Plaintiffs argue that Scott County itself should be liable based on the policies and customs promulgated by high ranking county officials such as the county attorney, the sheriff, and the director of HSD. Examples of the possible policies or customs include those relating to the manner of conducting the sex ring investigation, the training and supervision of county employees, and the purported failure of HSD to attempt to reunite families whenever possible. Plaintiffs state that the many criminal defendants in the sex ring investigation indicates the existence of a policy as opposed to mere isolated incidents, and plaintiffs assert that discovery will produce additional facts indicating various policies or customs.

The County responds that the actions of these high ranking county officials do not constitute county policies or customs. The County first points to *Spielman Motor Sales Company, Inc. v. Dodge,* 295 U.S. 89, 92–94, 55 S.Ct. 678, 679–80, 79 L.Ed. 1322 (1935) which held that a district attorney for a New York county was, under New York law, acting as an officer of the state when enforcing state laws. The *Dodge* Court had to decide whether the district attorney was acting as a state official in order to determine whether a federal law allowing injunctions against state officials would apply. *Dodge* did not involve an action under section 1983, and thus it does not stand for the proposition that a county attorney cannot make county policy in terms of section 1983 law.

The County does point to two section 1983 cases which are relevant to this issue. In *Familias Unidas v. Briscoe,* 619 F.2d 391, 404 (5th Cir.1980), the court held that in enforcing state law, a county judge was not acting as a county policy maker. The court observed that under Texas' governmental structure, county judges do undertake many actions in governing counties which would amount to making county policy under *Monell.* While implementing a law which gave the judge only narrow discretion, however, the judge was acting like a county sheriff enforcing a state law. The judge's implementation of the law, concluded the court, effectuated state policy and should not subject a particular county to liability under section 1983. *Familias Unidas,* 619 F.2d at 404.

Based on *Familias Unidas,* a district court held that a county could not be liable

for the policy a district attorney[30] established regarding the issuing of misdemeanor arrest warrants. *Crane v. State of Texas*, 534 F.Supp. 1237 (N.D.Tex.1982), *rev'd in part*, 759 F.2d 412 (5th Cir.), *aff'd on reh'g*, 766 F.2d 193 (1985) (per curiam). The district attorney created a policy whereby the clerk of court would issue a misdemeanor arrest warrant on the basis of a district attorney's affidavit. Thus, no neutral magistrate would make a probable cause determination before the arrest warrant issued. The district court declared the policy unconstitutional, but found that the county was not liable. The district court concluded that the policy was not a county policy because it was not created for the county, nor was it subject to the county's control. *Crane*, 534 Supp. at 1246. Like the judge in *Familias Unidas*, reasoned the district court, the district attorney was a state actor carrying out state policy. *Crane*, 534 F.Supp. at 1245–46.

The Fifth Circuit, however, reversed *Crane's* holding that the county was immune. *Crane v. State of Texas*, 759 F.2d 412 (5th Cir.), *aff'd on reh'g*, 766 F.2d 193 (1985) (per curiam). The court observed that county voters had elected the district attorney to his office, and he was able to establish the misdemeanor arrest warrant policy by virtue of his office. The district attorney, therefore, was a policy making official for the county and the county was liable under *Monell* for the policy he created. *See Crane*, 759 F.2d at 429–30; 766 F.2d at 194–95.

■ Here, plaintiffs allege that defendants Morris, Tietz, and the HSD established policies and customs regarding the Jordan sex ring investigations which caused violations of plaintiffs' rights. Morris and Tietz are two of the highest ranking elected officials in Scott County, and both are in positions to create county policies and customs. Similarly, the County is responsible for policies and customs of the HSD. *Dick*, 562 F.Supp. at 1095–96. Scott County, therefore, will be liable if Morris, Tietz, or the

HSD established policies or customs which caused violations of plaintiffs' rights. Thus granting Scott County's motion for summary judgment prior to plaintiffs' having the opportunity to conduct discovery would be inappropriate. Scott County is, however, entitled to partial summary judgment on the issue of punitive damages because punitive damages are not recoverable against municipalities under section 1983. *Newport*, 453 U.S. at 271, 101 S.Ct. at 2762.

## F. Guardians

After adult suspects were arrested on charges of sexually abusing children, the Scott County Department of Human Services (HSD) immediately initiated neglect proceedings in family court under Minn.Stat. § 260.133 in order to separate the children from their parents. Pursuant to Minn.Stat. § 260.155, subd. 4, the Scott County Family Court appointed guardians ad litem (guardians) for children whose parents had been charged in neglect proceedings. That statute requires a family court to appoint a guardian to protect the best interests of a minor in neglect proceedings.

Defendants Diane Johnson, John Manahan, and Paul Thomsen all served as court appointed guardians. Defendants Johnson and Manahan are defendants in *Buchan* and *Brown*, while defendant Thomsen is a defendant in *Myers* and *Bentz*. Defendant Thomsen became the guardian for the Bentz children in January of 1984. Thomsen made his first appearance in that capacity in family court on January 25, 1984. *See In re Bentz Children*, Feb. 3, 1984 Order, at 1. Thomsen became the guardian for the Myers children in February of 1984. Thomsen made his first family court appearance in that capacity on February 13, 1984. *See In re Myers Children*, Feb. 23, 1984 Order, at 1.

Defendant Johnson assumed the role of guardian for the Brown children on or about January 19, 1984. *See In re Brown Children*, Feb. 8, 1984 Order, at 1. John-

---

**30.** In Texas, a district attorney represents a district, which is usually one county. *Crane v.*

*State of Texas,* 766 F.2d 193, 195 (5th Cir.1985) (per curiam).

son became the guardian for the Buchan children on June 7, 1984. *See In re Buchan Children*, June 7, 1984 Order, at 1. In late 1984, defendant Manahan began to act as guardian for the Brown and Buchan children when Johnson was unavailable. Johnson was at times unavailable because she was in the latter stages of pregnancy during this period.

The following allegations of the Buchans against defendants Johnson and Manahan are virtually identical to all of the allegations against each guardian defendant.

Defendants Diane Johnson and John Manahan are the court appointed guardians ad litem for the Buchans' children. Defendants Johnson and Manahan, in addition to the other acts alleged herein, also engaged in a pattern of activity which was coercive and abusive to the minors placed under their direction by the Court in violation of their legal duties, in that they also interrogated the Buchans' children in an attempt to elicit additional accusatory responses from them as well as permitting defendant Morris and defendants Wilker, Tafs and Dean to question and interrogate the children under circumstances where it was apparent that their emotional and psychological well-being was threatened. Defendants Johnson and Manahan permitted and participated in the isolation and confinement of the Buchans' children in an attempt to coerce them into making responses which would be favorable for the State's case against their parents.

*Buchan* Complaint ¶ 6. All plaintiffs who are suing guardians also allege that the guardians were part of the civil conspiracy in which defendant Morris recklessly sought arrests and convictions in order to legitimize the claims of a Jordan sex ring. ▮▮▮▮ The guardian defendants argue that because they are court appointed officials, absolute judicial immunity shields them from all of plaintiffs' allegations. The Court agrees. Persons, governmental

or otherwise, who are integral parts of the judicial process are entitled to absolute immunity from damage liability under 42 U.S.C. § 1983. *Briscoe v. LaHue*, 460 U.S. 325, 335–36, 103 S.Ct. 1108, 1115–16, 75 L.Ed.2d 96 (1983).

Even before *Briscoe*'s pronouncements,[31] a number of courts had held that court appointed officials were entitled to absolute immunity. *E.g., T & W Investment Company, Inc. v. Kurtz*, 588 F.2d 801, 802 (10th Cir.1978) (receivers); *Kermit Construction Corp. v. Banco Credito y Ahorro Ponceno*, 547 F.2d 1, 3 (1st Cir. 1976) (receivers); and *Ashbrook v. Hoffman*, 617 F.2d 474, 476–77 (7th Cir.1970) (partition commissioners). The Eighth Circuit, moreover, has cited with approval two cases in which court appointed officials were afforded absolute immunity from section 1983 damages. *Lawyer v. Kernodle*, 721 F.2d 632, 636 (8th Cir.1983), *citing Bartlett v. Weimer*, 268 F.2d 860 (7th Cir. 1959), *cert. denied*, 361 U.S. 938, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960); and *Burkes v. Callion*, 433 F.2d 318 (9th Cir.1970) (per curiam), *cert. denied*, 403 U.S. 908, 91 S.Ct. 2217, 29 L.Ed.2d 685 (1971). In *Bartlett*, the court concluded that a physician appointed by the probate court to assess the mental health of the plaintiff was absolutely immune from a section 1983 action. The plaintiff alleged that the physician was part of a conspiracy to maliciously prosecute the plaintiff and to falsely commit plaintiff to a mental institution. *Bartlett*, 268 F.2d at 861. The court ruled that the probate court appointed the physician as an officer of the court to render a medical opinion, and that while acting in such capacity, the physician was protected by the absolute immunity enjoyed by judges and other judicial officers. *Bartlett*, 268 F.2d at 862. Similarly, the court in *Burkes*, 433 F.2d at 319, concluded that court appointed psychiatrists who gave medical reports to

**31.** *Briscoe* held that all trial witnesses, including police officers, were absolutely immune from damage liability under section 1983 for their testimony given at trial.

the trial court were entitled to absolute immunity.[32]

Subsequent to the Supreme Court's decision in *Briscoe*, the United States Court of Appeals for the Sixth Circuit applied *Briscoe* in holding that a court appointed guardian ad litem was entitled to absolute immunity in a section 1983 action. *Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir.1984). The court stated that the individual

> who functioned as guardian ad litem ... must act in the best interests of the child he represents. Such a position clearly places him squarely within the judicial process to accomplish that goal.

*Kurzawa*, 732 F.2d at 1458.

While *Kurzawa* is authority precisely on point, all plaintiffs attack the soundness of this decision. In assailing *Kurzawa*, some plaintiffs point to the Supreme Court's statement in *Tower v. Glover*, —— U.S. ——, 104 S.Ct. 2820, 2826, 81 L.Ed.2d 758 (1984), that Congress, and not the courts, is the body to establish new immunities for section 1983 actions. The *Tower* Court declined to grant absolute immunity to a public defender who allegedly conspired with state officials to convict the plaintiff. The Supreme Court reached this decision only after concluding that no immunity for public defenders existed at common law in 1871, and therefore the Congress which passed the Civil Rights Act could not have intended that such an immunity exist for section 1983 actions. *Tower*, 104 S.Ct. at 2825.

Based on *Tower*, plaintiffs argue that a court granting the guardians absolute immunity would constitute improper judicial creation of a new section 1983 immunity. Yet, when the Supreme Court has found that Congress intended section 1983 to encompass common law immunities prevalent at the time of the act's passage, the Supreme Court has recognized immunities under section 1983. *Tower*, 104 S.Ct. at 2825. The Supreme Court has recognized these immunities in spite of the fact that "[o]n its face § 1983 admits no immunities." *Tow-*

*er*, 104 S.Ct. at 2825. The Supreme Court has held, moreover, that the common law of 1871, and thus section 1983, provided absolute immunity for all persons who were integral parts of the judicial process. *Briscoe*, 460 U.S. at 335, 103 S.Ct. at 1115.

Thus, to conclude that a guardian is entitled to absolute immunity would not be to establish a new type of immunity against the dictates of *Tower*. Rather, protecting guardians with absolute immunity would simply be an instance of determining the contours of the already established immunity for persons acting as integral parts of the judicial process.

Plaintiffs put forth an additional argument challenging the validity of *Kurzawa*, as they claim that *Kurzawa* reads *Briscoe* much too broadly. *Briscoe* held that a police officer testifying at a trial enjoyed absolute witness immunity for his testimony, but a number of circuit courts have limited the application of *Briscoe*. In *Wheeler v. Cosden Oil and Chemical Co.*, 734 F.2d 254, 261 (5th Cir.), *mod. on other grounds*, 744 F.2d 1131 (1984), the court ruled that *Briscoe*'s absolute immunity for a witness' testimony at trial did not apply to one who knowingly gave false testimony at a probable cause hearing. Another court declared that *Briscoe*'s witness immunity did not extend to cover a witness engaged in an extra-judicial conspiracy with a prosecutor to give false testimony. *San Filippo v. U.S. Trust Co. of New York, Inc.*, 737 F.2d 246, 255 (2d Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985). Finally, *Krohn v. United States*, 742 F.2d 24, 31 (1st Cir. 1984), stated that *Briscoe* did not call for the granting of absolute immunity to a law enforcement officer who allegedly made intentional misrepresentations in a search warrant affidavit.

▪ The Court agrees with the decisions which hold that *Briscoe*'s witness immunity applies only to testimony at trial

---

**32.** The Ninth Circuit reaffirmed its *Burkes* holding in *Franklin v. State of Oregon, State Welfare*

*Division*, 662 F.2d 1337, 1345 (9th Cir.1981).

and not testimony in other proceedings. Such a narrowing of the holding in *Briscoe,* however, does not negate *Kurzawa's* reliance on *Briscoe.* *Kurzawa* concluded that guardians ad litem are entitled to absolute immunity because they are integral parts of the judicial process. *Kurzawa,* 732 F.2d at 1458. The determination of whether a guardian functions as an integral part of the judicial process does not depend on the scope of the witness immunity created in *Briscoe.*

The conclusion that guardians are integral parts of the judicial process is sound. Minn.Stat. § 260.155, subd. 4(a) requires that the family court appoint a guardian ad litem to protect the interests of the children in neglect or dependency proceedings. In a similar context (guardians for minors in probate proceedings), the Minnesota Supreme Court stated that a guardian is a fiduciary and an officer of the appointing court, subject to the orders and directions of that court. *Hoverson v. Hoverson,* 216 Minn. 237, 12 N.W.2d 497, 500 (1943). Thus, the Court concurs with *Kurzawa's* holding that court appointed guardians are entitled to absolute immunity.

Nevertheless, plaintiffs argue that even under *Kurzawa,* the guardian defendants should not prevail on the basis of absolute immunity. The guardians purportedly acted as investigators by attempting to elicit incriminating responses from the children, and by facilitating other defendants' attempts to elicit such responses. Plaintiffs reason that in acting as investigators, the guardians were acting beyond their duties as guardians, and that absolute immunity will therefore not protect them.

These allegations, however, are actually assertions that the guardians committed transgressions while performing their functions as guardians. Court orders directed guardians, or their designee, to be present at all interviews of the children. *E.g., In re Myers Children,* Feb. 23, 1984 Order, at 2. The family court also gave the guardi-

ans the right to participate in all interviews of the children, to the extent necessary to protect the children's best interests. *In re Kath Children,* Jan. 23, 1984 Stipulation, at 2 (this stipulation applied to nine family court cases, including *In re Bentz Children* ). Thus, even if the guardian defendants committed these alleged acts, they would have done so while performing their duties as guardians.

The cases cited with approval by the Eighth Circuit in *Lawyer,* moreover, indicate that absolute immunity protects the guardian defendants from plaintiffs' accusations. In both *Bartlett* and *Burkes,* the court appointed doctors allegedly lied. Yet the *Bartlett* court reasoned that because the physician was functioning in his capacity as a court appointed physician, he was entitled to absolute immunity. *Bartlett,* 268 F.2d at 862. *Accord Burkes,* 433 F.2d at 319. Obviously, the duties of these doctors did not include lying, but the courts granted them absolute immunity because their purported transgressions were part of their functions as court appointed officials.

Finally, plaintiffs argue that the guardian defendants cannot prevail on the basis of absolute immunity because the guardians conspired with other defendants. This reasoning is unpersuasive. In *Bartlett* the court granted the court appointed physician absolute immunity in spite of the plaintiff's charge that the physician had conspired to maliciously prosecute and falsely commit the plaintiff. *Bartlett,* 268 F.2d at 861. Thus, plaintiffs' allegations of conspiracy do not defeat the guardians' defense of absolute immunity, and absolute immunity shields the guardian defendants from all of plaintiffs' claims.

### G. Therapists

A number of therapists who dealt with alleged child abuse victims,[33] are also named as defendants in various Scott County cases. Most of these therapists were appointed by the Scott County Family

---

**33.** One therapist also conducted an adverse psychological interview of two adults in anticipa-

tion of the adults' upcoming criminal trial.

Court; one therapist was not a court appointed official; and the record is unclear as to whether one therapist was court appointed.

### 1. Court Appointed Therapists

After the children of accused sexual abusers were separated from their parents, the Scott County Family Court appointed therapists for the children. Minn.Stat. § 260.151, subd. 1, provides that a family court may appoint a duly qualified physician, psychiatrist, or psychologist to examine any minor under its jurisdiction. The following court appointed therapists are defendants in Scott County cases: Michael Shea, Leslie Faricy, Susan Phipps-Yonas, and Thomas Price.

Shea is a defendant in *Bentz* and *Buchan*, while Faricy is a defendant in *Bentz*.[34] With regard to the Bentz children, the family court directed therapist Faricy to evaluate and determine the psychological needs of the children. *In re Bentz Children*, Feb. 3, 1984 Order, at 2. The order named only Faricy, but defendant Shea, who is Faricy's partner, also had contact with the children. The family court was aware that both Faricy and Shea were dealing with the children. *See In re Bentz Children*, Memorandum accompanying Aug. 10, 1984 Order. In addition to his involvement with the Bentz children, Shea performed an adverse psychological interview of Donald and Cindy Buchan in preparation for the impending Buchan criminal trial.

In *Brown*, the sole therapist defendant is Phipps-Yonas.[35] The order in the Brown family court proceeding mandated that defendant Phipps-Yonas evaluate and give appropriate counseling to the Brown children. *In re Brown Children*, Feb. 8, 1984, Order, at 3.

Defendant Price[36] is a defendant in *Myers*, *Lallak*, and *Buchan*. Price was a court appointed official in the *Myers* family court matter, but he did not serve in such capacity with respect to the Lallak or Buchan children. Price states that he had no contact with the Lallak children, and that his only involvement with the Buchan children was one twenty-minute interview of one of the Buchans' daughters. Price aff. ¶ 7–9. The family court directed defendant Price to evaluate the Myers children and to determine their counseling needs, and other issues which needed to be addressed. *In re Myers Children*, Feb. 23, 1984 Order, at 2. Subsequent to the commencement of the *Myers* family court proceeding, and subsequent to Price's appointment, the Myers children implicated a variety of individuals as child sex abusers. The statements of the Myers children later formed the basis for the arrest of, inter alia, Jane Myers, the Lallaks, and the Buchans.

The plaintiffs allege that the therapist defendants provided Morris with psychological evaluations of the children of the plaintiffs. They further charge that the therapists interrogated the children, and psychologically manipulated them to transmit confirmation of allegations against the adult plaintiffs. *E.g.*, *Bentz* Complaint ¶ 6; *Buchan* Complaint ¶ 7. Plaintiffs' briefs elaborate on their theory against the therapists. Instead of providing therapy and independent counseling to the children, argue plaintiffs, the therapists became part of the investigatory team which sought to obtain convictions for child sexual abuse. The therapists purportedly agreed with other investigators to develop evidence against the adult plaintiffs in reckless disregard of the truth. Plaintiffs reason that the therapists isolated the children from their parents to make the children emotionally dependent upon Morris and other investigators. In this way, conclude plaintiffs, the children would be responsive to

---

**34.** In each of these cases, the professional association to which Shea and Faricy belong, Shea & Associates, P.A., is also a defendant.

**35.** Phipps-Yonas and Price, P.A., is also a defendant.

**36.** Phipps-Yonas and Price, P.A. is also named as a defendant in these cases.

their investigators and would thus provide the desired accusatory statements.

In support of their allegations that defendant Price acted as an investigator, plaintiffs rely on findings of the family court which criticize Price's conduct in dealing with the children. *In re Myers Children,* Feb. 11, 1985 Order, findings 14 and 18. An additional allegation specific to defendant Price is that although he held himself out as a "psychotherapist" he was actually practicing psychology without a license. *E.g., Buchan* Complaint ¶ 7. Defendant Price states that he is not a psychologist, and his business stationery and his own affidavit refer to him as a psychotherapist. Price aff. ¶ 1, and exh. A. Price states that he engaged a licensed psychologist, Dr. Judy Bevans, to perform the psychological tests of the Myers children. Price aff. ¶ 3.

The Court's prior discussion regarding court appointed guardians indicates that court appointed therapists are protected by absolute immunity while they function as court appointed officials. The Eighth Circuit has cited with approval two section 1983 cases which gave court appointed doctors and psychiatrists absolute immunity. *Lawyer v. Kernodle,* 721 F.2d 632, 636 (8th Cir.1983), *citing Bartlett v. Weimer,* 268 F.2d 860 (7th Cir.1959), *cert. denied,* 361 U.S. 938, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960), and *Burkes v. Callion,* 433 F.2d 318 (9th Cir.1970) (per curiam), *cert. denied,* 403 U.S. 908, 91 S.Ct. 2217, 29 L.Ed.2d 685 (1971). The allegations against defendants Faricy, Phipps-Yonas, and the Bentzes' allegations against defendant Shea, all constitute claims that these defendants committed abuses while functioning as court appointed therapists. These defendants are thus cloaked with absolute immunity.

The Court originally rejected defendant Price's claim to absolute immunity, but upon reconsideration, the Court will grant his motion for summary judgment on the basis of this defense. True, Minn.Stat. § 260.151, subd. 1, calls for court appointment of a qualified physician, psychiatrist,

or psychologist, and Price is not licensed in any of those disciplines. Nevertheless, the family court saw fit to designate Price a court appointed official. Even though the family court was later critical of Price's performance, his purported transgressions occurred while he was functioning as a court appointed official. Price, therefore, is protected by absolute immunity.

Defendant Shea's role in *Buchan* is somewhat different than the other therapist defendants. Shea did not have contact with the Buchan children, rather he conducted an adverse psychological interview and evaluation of Donald and Cindy Buchan in preparation for their impending criminal trial. Shea aff. ¶ 3. The record is unclear whether the trial court specifically named Shea to conduct the evaluation or whether the trial court merely allowed the county attorney's office to select its own expert to conduct the adverse examination. In either case, Shea is entitled to absolute immunity. If a court directed Shea to conduct an adverse mental exam, then Shea should be entitled to absolute immunity as a court appointed official. Shea would also be protected by absolute immunity if the court merely allowed the county attorney's office to select an expert of its choosing. Conducting an adverse mental examination in anticipation of trial is an activity in preparation for trial, and prosecutors enjoy absolute immunity for their trial preparation. *See Imbler v. Pachtman,* 424 U.S. 409, 431 n. 33, 96 S.Ct. 984, 995 n. 33, 47 L.Ed.2d 128 (1976). Prosecutorial assistants also enjoy absolute immunity for actions which are within protected prosecutorial functions. *Lawyer,* 721 F.2d at 636; *Keating v. Martin,* 638 F.2d 1121, 1122 (8th Cir. 1980) (per curiam). In conducting the adverse examination for the county attorney's office, Shea would have assumed the role of prosecutorial assistant and thus Shea would enjoy absolute immunity. Because Shea would be protected by absolute immunity in either case, he is entitled to summary judgment in *Buchan.*

## 2. Noncourt Appointed Therapists

Noncourt appointed therapist Jane McNaught is a defendant in *Meger*. McNaught is a licensed consulting psychologist and she practices with an association known as the Center for Child and Family Therapy (Center) in Minneapolis. The Center is also a defendant in *Meger*. Defendant McNaught's initial involvement with the Meger family was in December of 1983. The Scott County Human Services Department (HSD) requested McNaught to conduct a psychological evaluation of the Megers' youngest son because the Meger children (two boys) had been identified as sexual abuse victims of James Rud. McNaught aff. ¶ 3; Morris aff. ¶ XXXIII. After her initial contact with the youngest son, McNaught states that she had no further involvement with the Meger children until July of 1984. McNaught aff. ¶ 4.

During the interim, from December until June of 1984, Scott County investigators continued questioning the Meger children. In early June of 1984, the Meger children purportedly accused their parents of abusing them.[37] Morris aff. ¶ XXXIII. Scott County officials separated the Meger children from their parents on June 5, 1984. Defendants state that Wanda Meger assented to a voluntary placement while Wanda Meger states she was pressured and misled into signing the placement agreement. Morris aff. ¶ XXXIII, exh. U; Wilker aff. ¶ XXXVII; Meger aff. ¶ 47–51.

Subsequently, Mary Tafs of HSD requested that McNaught perform therapy, counseling, and an evaluation for both Meger children. McNaught aff. ¶ 4; Morris aff. ¶ XXXIII. McNaught had sessions with these children in July and August of 1984. McNaught states that the Meger children described being sexually abused by Rud and by their parents. McNaught aff. ¶ 5. McNaught told Tafs of the children's statements in August of 1984, and recommended that the children not have contact with their parents until after the parents received treatment. McNaught aff. ¶ 6.

The Scott County Attorney's office never criminally charged the Megers. After the Megers rescinded their voluntary placement agreement, the Scott County Attorney's office instituted neglect proceedings in a petition dated August 27, 1984. Wolf aff. exh. A. The petition contained information supplied by McNaught. Wolf aff. exh. A. McNaught states that she had no involvement in the decision to file the neglect petition. McNaught aff. ¶ 8.

Plaintiffs alleged that McNaught conspired with defendant Morris and others by providing false and misleading psychological evaluations and reports. Plaintiffs further allege that the tainted reports and evaluations were a result of defendant McNaught's coercive and intimidating techniques of interrogating the Meger children. Plaintiffs only reference to the Center is that defendant McNaught practices with the Center. *Meger* Complaint ¶ 9.

### a. Color of State Law

In order to be subject to liability under section 1983, a defendant must act under color of state law. *E.g., Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). Defendant McNaught argues that as a therapist retained by HSD, she was not acting under color of state law. The Eighth Circuit's decision in *Lawyer v. Kernodle*, 721 F.2d 632 (8th Cir.1983), however, indicates that McNaught was a state actor. In *Lawyer*, the court held that a private physician retained by the county coroner to perform autopsies was acting under color of state law. *Lawyer*, 721 F.2d at 635. The court reasoned that even though the doctor was a private individual, he was a state actor because he was performing official duties of the coroner. *Lawyer*, 721 F.2d at 635.

Similarly, McNaught was aiding HSD in the performance of its official

---

**37.** Wanda Meger states that county officials only told her of accusations against her hus-

band. Meger aff. ¶ 14, 17, 46.

duties. Minn.Stat. § 626.556, subd. 10(a), provides that a local welfare agency (such as HSD) must conduct an immediate assessment of child sexual abuse charges. The statute also requires that the agency offer protective social services to enhance the welfare of the abused child. Minn.Stat. § 626.556, subd. 10(a). HSD retained McNaught to perform an evaluation and provide counseling to the children. Tasks such as these would also be performed by a psychologist who was an employee of HSD. *See* Kaufman aff. ¶ V. McNaught was thus aiding HSD in the performance of its statutory duties, and therefore she is a state actor.

■ An alternative basis for concluding that McNaught acted under color of state law is the clear rule that private individuals who willfully participate in joint action with government officials act under color of state law. *E.g., Dennis v. Sparks*, 449 U.S. 24, 27–28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980). Defendant McNaught acknowledges this rule of law, but she argues that plaintiffs' claims of conspiracy are without merit. Defendant McNaught stresses that conclusory allegations of conspiracy, without references to material facts, are insufficient to state a claim. *Citing Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir.1977), *cert. denied*, 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978). There may be much to McNaught's questioning the existence of the purported conspiracy. However, the Megers' conspiracy allegations do delineate McNaught's alleged role in the conspiracy. McNaught supposedly conducted improper interviews of the Meger children in order to further the conspiracy to fabricate sexual abuse charges. While denying she committed these transgressions, McNaught acknowledges that she had contact with the Meger children. The Megers' accusations against McNaught are more specific than a mere statement that a conspiracy existed and

that McNaught was involved in it. McNaught's purported acts are clear, and thus the allegations against her are sufficient to cause her to be treated as a state actor.

**b. Absolute Immunity**

■ While defendant McNaught concedes that she is not a court appointed official; she still argues that she is protected by absolute immunity. McNaught relies largely on statements in *Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir.1984), which indicated that a psychologist and two psychiatrists who were not court appointed were absolutely immune from suit.[38] In reaching this conclusion, the court drew upon *Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), which established absolute immunity for a witness testifying at trial. In *Kurzawa*, the state department of social services and the state courts used the findings of the psychologist and the two psyciatrists. The *Kurzawa* court reasoned that the psychologist's and psychiatrist's provision of information to these entities was analogous to the testimony of a witness, and therefore the psychologist and psychiatrists were entitled to absolute immunity based on *Briscoe*. *Kurzawa*, 732 F.2d at 1458.[39]

This aspect of *Kurzawa* is unsound. Initially, this pronouncement was clearly dicta, as the court had already dismissed the psychologist and psychiatrists on the basis of the statute of limitations. The *Kurzawa* court's analogy to a witness, moreover, is misplaced. A number of circuits have stressed that *Briscoe*'s absolute immunity is limited to trial testimony only. *E.g., Wheeler v. Cosen Oil and Chemical Co.*, 734 F.2d 254, 261 (5th Cir.), *mod. on other grounds*, 744 F.2d 1131 (1984) (no absolute immunity for testimony at probable cause hearings); *Krohn v. United States*, 742 F.2d 24, 31 (1st Cir.1984) (no absolute im-

---

**38.** As previously discussed, *Kurzawa* held that court appointed guardians ad litem were entitled to absolute immunity in section 1983 actions because guardians were integral parts of the judicial process. *Kurzawa*, 732 F.2d at 1458.

**39.** The HSD defendants also pointed to these statements in *Kurzawa* in arguing that they were protected by absolute immunity.

munity for statements in search warrant affidavit). One of the rationales for limiting absolute witness immunity to actual trials is that only in such a setting do sufficient safeguards exist for developing the truth (*e.g.*, cross-examination). *Wheeler*, 734 F.2d at 261; *Krohn*, 742 F.2d at 31. Under this rationale, noncourt appointed psychologists should not be entitled to absolute witness immunity for information provided outside of trial setting. The *Kurzawa* court, therefore, incorrectly concluded that noncourt appointed psychiatrists and a psychologist were protected by absolute immunity.[40] Consequently, McNaught cannot rely on this defense.

**c. Qualified Immunity**

■ Defendant McNaught asserts that even if she is not protected by absolute immunity, she is entitled to summary judgment on the basis of qualified immunity. McNaught, however, allegedly contributed to the infringement of the Megers' clearly established right to remain together as a family. Accordingly, McNaught cannot obtain summary judgment prior to discovery.

**d. Lack of Causation**

■ Regardless of her ability to prevail on immunity defenses, defendant McNaught asserts that her summary judgment motion should still be granted. Defendant McNaught argues that even if she acted improperly and plaintiffs' rights were infringed, she did not cause plaintiffs' injury. Defendant McNaught is correct that in order for her to be liable under section 1983, her transgressions must have a causal relationship to plaintiffs' injuries. *E.g., City of Oklahoma City v. Tuttle*, —— U.S. ——, 105 S.Ct. 2427, 2439, 85 L.Ed.2d 791 (1985) (Brennan, J., concurring); *Herrera v. Valentine*, 653 F.2d 1220, 1224 (8th Cir. 1981); *see also Hampton v. Mouser*, 701 F.2d 766, 767 (8th Cir.1983) (per curiam).

Defendant McNaught reasons that she did not cause the Megers to be separated from their children, since she did not relate the children's allegations of parental sexual abuse until after Wanda Meger voluntary placed the children in foster care. McNaught admits, however, that the information she gave to social worker Tafs was included in the August 27, 1984 neglect petition which commenced family court proceedings to remove the Meger children.[41] McNaught states that even if the information she provided was false, the neglect petition still contained other information sufficient to establish probable cause. Thus, McNaught concludes that her actions could not have caused the separation of the Meger family.

The Meger neglect petition does contain accusations of parental child sexual abuse reported by individuals other than defendant McNaught, but her statements provide important corroboration. Even if McNaught's statements were not necessary to the probable cause determination, her subsequent interviews with the children, if coercive, could have contributed to the continued separation of the Meger family. Thus, concluding at this juncture that McNaught could not have caused injury to plaintiffs would be inappropriate.

**e. The Center**

The association with which defendant McNaught practices, the Center, is also a defendant in *Meger*. The Center is an association of independent practitioners providing psychological and counseling services. McNaught aff. ¶ 10. The Center is essentially an office sharing arrangment, as the professionals at the Center have their own independent practices and clientele. The professionals at the Center do not exercise professional control over each others' decisions. McNaught aff. ¶ 10.

---

**40.** Of course a noncourt appointed therapist, just like any other witness, would enjoy absolute immunity for any testimony given at a trial. *See Briscoe*, 460 U.S. at 334, 340–41, 103 S.Ct. at 1118. Here, the Megers are not seeking to hold McNaught liable on the basis of any trial testimony.

**41.** The County filed a neglect petition after the Megers rescinded their voluntary agreement.

The Center is named as a defendant in this action apparently because of plaintiffs' allegation that McNaught practices with the Center. Plaintiffs, however, make no other reference to the Center in their complaint or in their brief. The Center's contention that its members do not direct or exercise control over their fellow members is not contested. The mere fact that defendant McNaught practices with the Center is not a sufficient basis for subjecting the Center to section 1983 liability, *see Ashbrook v. Hoffman*, 617 F.2d 474, 477–78 (7th Cir.1980), and thus the Court granted the Center's motion for summary judgment.

### 3. DeVries

█ The remaining therapist defendant, Susan DeVries, is a defendant in only *Buchan*. According to DeVries, her initial appointment concerning the Buchan children was on June 22, 1984, when social worker Dorris Wilker provided her with background information. (DeVries briefly met one of the Buchan daughters that day.) DeVries aff. ¶ 3, 6. This meeting was subsequent to the arrest of the parents and the children's removal from the home on June 4, 1984.

DeVries states in her brief that she "was requested to provide information" regarding the psychological well-being of the Buchan children, but the record is unclear as to who asked DeVries to contact the Buchan children. At whose bequest DeVries saw the children is an important question in determining whether she is entitled to absolute judicial immunity.

In her affidavit, DeVries indicates that the guardian ad litem for the Buchan children was the first to request that DeVries counsel and evaluate the Buchan children. DeVries aff. ¶ 2. DeVries, however, testified at a family court hearing that HSD referred the Buchan case to her. *In re Buchan Children*, Transcript of DeVries Testimony, Aug. 28, 1984, at 46. DeVries indicated that social worker Mary Tafs was the individual who asked her to contact the Buchan children. *Id.* at 48.[42]

This evidence is conflicting on the issue of whether DeVries was a court appointed therapist, and orders of the Scott County Family Court do not resolve the issue. In the family court proceedings regarding the Bentz, Brown, and Myers children, the initial order of the family court designated that a therapist contact the children. *In re Bentz Children*, Feb. 3, 1984 Order, at 2; *In re Brown Children*, Feb. 8, 1984 Order, at 3; *In re Myers Children*, Feb. 23, 1984 Order, at 2. By contrast, the initial family court order regarding the Buchan children does not direct DeVries or any other therapist to see the children. *In re Buchan Children*, June 7, 1984 Order. A family court order issued five months later does direct the Buchan parents to meet with their daughter's therapist, defendant DeVries, for supervised visitation. *In re Buchan Children*, Nov. 15, 1984 Order, at 2. This order, however, does not necessarily indicate that the family court was designating DeVries a court appointed official. Another possibility is that the family court, being aware that HSD had retained DeVries, simply directed the Buchans to meet with the HSD retained therapist. Even if this family court order could be construed as a court appointment, DeVries would not be protected by absolute immunity for her allegedly improper interviews of the Buchan children from June until November, 1984. Thus, the Court cannot conclude on the record before it that DeVries is cloaked by absolute immunity for her purported transgressions.

Neither does qualified immunity provide a basis for granting DeVries' summary

---

**42.** In opposing DeVries' motion, the Buchans claimed that social worker Wilker requested DeVries to investigate whether sexual abuse had occurred, and that DeVries testified about this request at the Buchan family court hearing. At the time the Buchans made these contentions, the transcript of the family court hearing was unavailable. The Court did not receive a copy of the transcript until approximately one week ago. DeVries actually testified that Tafs gave her instructions which included determining, if possible, whether sexual abuse had occurred. *In re Buchan Children*, Transcript of DeVries Testimony, Aug. 28, 1984, at 48.

judgment motion at this juncture. DeVries supposedly aided in the fabrication of false allegations of sex abuse against the Buchan parents, and these allegations could have contributed to the continued separation of the Buchan family. Such conduct would violate the Buchans' clearly established right to remain together as a family, and thus summary judgment is inappropriate prior to discovery.

## H. Jordan Defendants

In *Lallak*, the plaintiffs have included as defendants a number of individuals and entities associated with the City of Jordan. These defendants are the City of Jordan, Jordan City Council, former Mayor of Jordan Gail Anderson, current Mayor Donald Tillman, the Jordan Police Department, Jordan Police Chief Alvin Erickson, Jordan Police officer Larry Norring, and other unknown employees of the Jordan Police Department.[43]

The Jordan sex ring investigation commenced on September 26, 1983, when Chris Brown contacted the Jordan Police Department because she feared that her children had been sexually abused. The Jordan Police Department assigned officer Larry Norring to investigate these charges. Erickson aff. ¶ 3, 4. Plaintiffs assert that Norring did not have the necessary and proper credentials to be a police officer at this time, and that he had no training in child abuse investigations. Norring was the only Jordan police officer involved in these investigations. Erickson aff. ¶ 8; Norring May 12, 1985 aff. ¶ 9. Initially, Jordan Police Chief Erickson requested and obtained investigative assistance from the Minnesota Bureau of Criminal Apprehension (BCA). The BCA, though, later withdrew in favor of the Scott County Sheriff's Department and Attorney's office. Erickson aff. ¶ 6, 7. In response to a request by County Attorney Morris, Erickson issued an order assigning Norring to the Scott County Attorney's office to assist in the investigation. Erickson aff. ¶ 9.

Prior to Norring's involvement in the Jordan sex ring investigation, the Lallaks had begun to complain to the Jordan City Council about improprieties in the Jordan Police Department. The Lallaks started airing their grievances in the spring of 1983, and on or about August 1, 1983, the Lallaks submitted a petition to the council calling for an investigation of the Jordan Police Department. The petition concerned allegations that Erickson and Norring misused departmental property. In addition, Charles Lallak questioned the status of Norring's certification as a law enforcement officer at a February 6, 1984 city council meeting. *See* Lallaks' Answers to Interrogatory 4. The Lallak brief contends that after this council meeting both defendants Erickson and Norring stated to Charles Lallak that they would get Lallak for filing the petition. (The affidavit states only that "a Jordan police officer [indicated that] the Jordan police would get" Lallak. *See* Lallak aff. ¶ 3.)

Also in early February of 1984, Norring and Scott County deputy sheriffs were interviewing the children of Jordan police officer Greg Myers. The Jordan defendants state that when the children mentioned Greg Myers as a possible child sexual abuser, Norring left the room immediately. *See* Norring May 12, 1985 aff. ¶ 10, 11. Upon learning that one of his officers was a potential subject of charges, Erickson informed Morris that the Jordan Police Department would not be involved in the Myers investigation. Morris agreed that this was the proper procedure. Erickson aff. ¶ 10.

Greg Myers was arrested on February 6, 1984, and the Meyers children were taken from their home that same day. In the ensuing months, the Myers children were interviewed, and in May of 1984, the children implicated the Lallaks as child sexual abusers. Based on these allegations, Scott

---

**43.** The Court will occasionally refer to these defendants collectively as the "Jordan defendants."

County deputies arrested the Lallaks on May 23, 1984.

The case against the Lallaks was related to the case against the Myerses. The Jordan defendants state that once the Myers children first raised the possibility that Greg Myers had sexually abused children, no Jordan police officer ever interviewed the Myers children. According to the Jordan defendants, because the Jordan police withdrew from the Myers investigation, the Jordan police were not connected in any way with the Lallak investigation. No Jordan police official, conclude defendants, played any role in developing the information which formed the basis of the charges against the Lallaks.

The Jordan defendants also state that City of Jordan governmental officials had no involvement in the criminal cases. Defendants add that neither the city council nor the mayor's office had formal or informal contact with any Scott County authorities requesting the investigation of the Lallaks or any other specific individuals. Defendants do admit that the council was aware of public concern regarding overtime payments to Norring. Plaintiffs point to the council's approval of overtime for Norring as an indication that the council was aware of Norring's involvement in the investigation. Plaintiffs further contend that Erickson and the council were aware that Norring lacked proper credentials and experience.

The major theme of plaintiffs' argument against the Jordan defendants is that Erickson and the City of Jordan were grossly negligent or exhibited deliberate indifference to plaintiffs' rights by assigning inexperienced, ill-trained, and unlicensed officer Norring to the Jordan sex ring investigation. Yet for the Jordan defendants to be liable under section 1983, their acts must have some causal relationship to plaintiffs' injuries. *E.g., City of Oklahoma City v. Tuttle,* — U.S. —, 105 S.Ct. 2427, 2439, 85 L.Ed.2d 791 (1985) (Brennan, J., concurring); *Herrera v. Valentine,* 653 F.2d 1220, 1224 (8th Cir.1981); *See also Hampton v. Mouser,* 701 F.2d 766, 767 (8th Cir.

1983) (per curiam). The Jordan defendants contend that neither Norring, nor any other Jordan defendant, was involved in the phase of the Jordan sex ring investigation which led to the charges against the Lallaks. Erickson aff. ¶ 11; Norring May 12, 1985 aff. ¶ 12. If Norring did not participate in formulating the charges against the Lallaks, his purported lack of training and supervision could not have caused plaintiffs' injuries. Similarly, the alleged transgressions of the other Jordan defendants could not have contributed to the harm plaintiffs suffered if no Jordan defendant was involved in the investigation which led to the Lallaks' arrest.

Plaintiffs did not respond to the contention that no Jordan defendant participated in the investigation of the Lallaks. Neither in their brief nor at oral argument did plaintiffs attempt to rebut defendants' lack of causation argument. In fact, plaintiffs have not even alleged specific facts to support their assertions that the Jordan defendants violated plaintiffs' rights. In response to interrogatories, plaintiffs do state that the Jordan defendants acted in reprisal against plaintiffs because of plaintiffs' accusations against the Jordan police at city council meetings, but plaintiffs fail to specify what actions the Jordan defendants supposedly undertook. Plaintiffs merely list the litany of violations asserted against Morris and state that the Jordan defendants conspired with the other defendants. *See* Lallaks' Answers to Interrogatory 4.

■ With regard to the Jordan defendants, plaintiffs have, in essence, simply alleged that a conspiracy existed and that the Jordan defendants were a part of it. Plaintiffs have not attempted to delineate the Jordan defendants' role in the conspiracy. Such conclusory allegations of conspiracy without allegations of specific facts are insufficient to state a claim under section 1983. *Slotnick v. Staviskey,* 560 F.2d 31, 33 (1st Cir.1977), *cert. denied,* 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978); *see also Ellingburg v. King,* 490 F.2d 1270, 1271 (8th Cir.1974) (per curiam) (broad and

conclusory allegations unsupported by factual allegations are insufficient to state a claim under section 1983). Since the plaintiffs did not put forth arguments or allegations indicating how the Jordan defendants could have caused plaintiffs' injuries, they are entitled to summary judgment. The Court originally granted summary judgment in favor of all Jordan defendants except defendant Norring. Upon reconsideration, the Court concludes that the rationale for granting the former motions indicates that defendant Norring is entitled to summary judgment as well.

## V. CONCLUSION

Virtually all defendants in the Scott County cases moved for dismissal and/or summary judgment prior to discovery. The Court granted some of these motions and denied others.[44] In this Memorandum Opinion the Court vacates its previous denial of summary judgment motions on behalf of Thomas Price, Phipps-Yonas and Price, P.A., and Larry Norring.

Defendants who continue to be parties in these cases assert that plaintiffs' accusations are wholly unfounded. While this may or may not be the case, the Court cannot, at this juncture, simply accept defendants' version of the facts as true. Plaintiffs are claiming violations of clearly established rights, and thus they are entitled to conduct discovery to develop their claims against the remaining defendants.

Based on the foregoing, IT IS ORDERED that the Court's order of June 10, 1985, denying the motions for summary judgment on behalf of Thomas Price and Phipps-Yonas and Price, P.A., in *Myers* (CIVIL 4–84–1066), *Lallak* (CIVIL 4–84–1230), and *Buchan* (CIVIL 3–84–1615); and the Court's order of June 10, 1985, denying the motion for summary judgment on behalf of Larry Norring in *Lallak* (CIVIL 4–84–1230), are vacated. Said motions for summary judgment on behalf of defendants Thomas Price, Phipps-Yonas and

Price, P.A., and Larry Norring are hereby granted.

## APPENDIX

The Court has granted the summary judgment motions of the following defendants:

**Guardians Ad Litem:**

Diane Johnson and John Manahan in *Buchan* (CIVIL 3–84–1615) and *Brown* (CIVIL 3–85–337)

Paul Thomsen in *Myers* (CIVIL 4–84–1066) and *Bentz* (CIVIL 3–85–336)

**Therapists:**

Thomas Price and Phipps-Yonas & Price, P.A. in *Myers, Lallak* (CIVIL 4–84–1230), and *Buchan* [1]

Michael Shea and Shea & Associates, P.A. in *Buchan* and *Bentz*

Center for Child & Family Therapy in *Meger* (CIVIL 3–85–138)

Leslie Faricy in *Bentz*

Susan Phipps-Yonas and Phipps-Yonas & Price, P.A. in *Brown*

**Jordan Defendants:**

City of Jordan, Jordan City Council, former Mayor Gail Anderson, Mayor Donald Tillman, Jordan Police Department, Jordan Police Chief Alvin Erickson, and Larry Norring [2] in *Lallak*

**Scott County Board of Commissioners:**

Scott County Board of Commissioners in *Lallak*

The Court granted summary judgment in favor of all the defendants in *Gould.* These defendants are:

**Gould**

County of Scott, R. Kathleen Morris, individually and as County Attorney, City

---

44. See Appendix attached.

1. The Court originally denied these motions.

2. The Court originally denied defendant Norring's motion.

of Jordan, City of Jordan Police Department, Sheriff of Scott County [3]

The Court granted defendant Earl Barrett's motion to dismiss in *Bentz* in an order dated August 20, 1985. Barrett is the director of a halfway house in which one of the Bentz children stayed.

The Court has denied the motions to dismiss or for summary judgment of the following defendants:

**County Attorney:**
R. Kathleen Morris in *Myers, Rank* (CIVIL 4–84–1214), *Lallak, Buchan, Meger, Bentz,* and *Brown*

**Scott County Deputy Sheriffs:**
Michael Busch and Patrick Morgan in *Myers, Lallak, Buchan, Meger,* and *Bentz*
Norman Pint in *Myers, Lallak, Buchan,* and *Bentz*
David Einertson in *Lallak*

**Therapists:**
Susan DeVries in *Buchan*
Jane McNaught in *Meger*

**Human Services Department:**
Scott County Human Services Department in *Myers, Lallak, Buchan, Meger, Bentz,* and *Brown*

Margaret Subby and Doris Wilker in *Myers, Buchan, Meger, Bentz,* and *Brown*
Joel Kaufman in *Meger*
Rachel Paff in *Lallak*
Mary Tafs and Judy Dean in *Buchan*

**Sheriff:**
Douglas Tietz in *Myers, Lallak,* and *Buchan*

**Scott County:**
Scott County in *Myers, Rank, Lallak, Buchan, Meger, Bentz,* and *Brown*

Plaintiffs have voluntarily dismissed the following defendants:

**Scott County Board of Commissioners:**
Scott County Board of Commissioners in *Meger*

**Scott County Commissioners:**
Anthony Worm, Dick Mertz, Mark Stromwall, Roland Boegeman, and William Knoiarski, individually and as Scott County Commissioners in *Rank*

---

**3.** The Court originally denied the motions of Morris and the Sheriff in *Gould.*